**IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**TERRY LIGHTHEART,**
**An Individual,** *on behalf of herself*
*and all others similarly situated,*

**PLAINTIFF,**

**VERSUS**                                    **CAUSE NO.** 3:23-cv-365-HTW-LGI

**THE SALVATION ARMY;**
**THE SALVATION ARMY d/b/a**
**THE SALVATION ARMY NATIONAL**
**CORPORATION, A New Jersey**
**Non-profit Corporation;**
**THE SALVATION ARMY**
**d/b/a THE SALVATION ARMY**
**USA SOUTHERN TERRITORY,**
**A Georgia Non-profit Corporation;**
**JEFF JELLETS, An Individual;**
**MARK HUNTER, An Individual;**
**KENT DAVIS, An Individual;**
**MICHAEL HAWLEY, An Individual;**
**TREY JONES, An Individual;**
**J. KEVIN SMITH, An Individual;**
**RULE ONE CONSULTING, LLC,**
**A Florida Limited Liability Company;**
**GINA OUBRE, An Individual;**
**JOHN/JANE DOE No. 1;**
**JOHN/JANE DOE No. 2;**
**JOHN/JANE DOE No. 3;**
**JOHN/JANE DOE No. 4; and**
**JOHN/JANE DOE No. 5**

**DEFENDANTS.**
_____/

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

COMES NOW, **Plaintiff, Terry Lightheart,** through undersigned counsel, and files, on

behalf of herself and all others similarly situated, her Complaint and Demand for Jury Trial in

the above-styled action against Defendants, The Salvation Army ("**The Salvation Army**"), The

Salvation Army d/b/a The Salvation Army National Corporation (the "**Salvation Army USA**"),

The Salvation Army d/b/a The Salvation Army USA Southern Territory (the "**Salvation Army**

**Southern Territory**")[1], Jeff Jellets ("**Jellets**"), Mark Hunter ("**Hunter**"), Kent Davis ("**Davis**"),

Michael Hawley ("**Hawley**"), Trey Jones ("**Jones**"), J. Kevin Smith ("**Smith**"), Rule One

Consulting, LLC ("**Rule One**"), and Gina Oubre ("**Oubre**") (collectively, the **"Defendants"**) for

violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (42 U.S.C. §

2000e) and other violations of federal and state law.  In support thereof, Plaintiff Lightheart

submits the following:

PRELIMINARY STATEMENT

1.      The Salvation Army hired Ms. Lightheart on August 3, 2015, as its Divisional

Emergency Disaster Services Director ("Divisional EDS Director") for the Alabama, Louisiana,

and Mississippi Division of the USA Southern Territory ("ALM Division").

2.      Ms. Lightheart is a Christian who has chosen to practice her faith in a

denomination other than The Salvation Army.  Defendant The Salvation Army was aware that

Ms. Lightheart was not a Salvationist at the time it offered her the Divisional EDS Director

position, when she was onboarded as a Salvation Army employee, and during all relevant times

to her employment with The Salvation Army.

---

[1] The Salvation Army is a single international religious and charitable organization headquartered in London, England. Although its global presence is organized into branches known as regions and territories, it brands itself, markets itself, and solicits contributions, gifts, and donations on behalf of itself as "One Army." In this pleading, Plaintiff Lightheart's use of "The Salvation Army" refers to the organization corporately and collectively as it does, as "One Army," inclusive of the named regional and territorial defendants. Where appropriate and/or necessary for clarification, the individual regional and territorial defendants will be referenced specifically by the relevant designations provided herein.

3.     Ms. Lightheart was at the time of her hiring by The Salvation Army particularly qualified for the position for which she was hired.  First, Ms. Lightheart holds a Bachelor of Science Degree in Emergency Management with a minor in Homeland Security, having earned her degree and having graduated *Cum Laude*. Indeed, the Epsilon Pi Phi Honor Society, a prestigious scholastic honor society recognizing academic achievement among students in the fields of emergency management, homeland security and disaster research and science, inducted Ms. Lightheart as a Life-time Member, in part, because of her stellar academic record in the fields of Emergency Management and Homeland Security.

4.     Ms. Lightheart is a Mississippi Certified Emergency Manager ("MCEM") through the Mississippi Civil Defense/Emergency Management Association ("MCDEMA") and a nationally Certified Emergency Manager ("CEM") through the International Association of Emergency Managers ("IAEM").  Ms. Lightheart, in fact, is the only female currently holding the IAEM-CEM designation in the State of Mississippi. She is one of only nine IAEM-CEMs in the state. and one of approximately 2,000 recipients earning this certification in the whole of the United States.

5.     She has over twenty (20) years of emergency management and community service experience working as both an employee and as a volunteer and serving most of this time in important leadership roles. Over fourteen (14) years of this experience includes chairing or co-chairing the following national or state emergency management focused committees, caucuses, or task forces: the Mississippi State Department of Health Mass Fatality Task Force – Co-Chair, (July 2009 – July 2011); the Mississippi Governors' Active Shooter Task Force – Chair (December 2012 – February 2014); the IAEM Strategic Planning Committee – Chair, (November 2013 – October 2016); the IAEM Faith-Based Organizations Caucus – Chair,

(October 2016 – October 2021); the Mississippi Volunteers Active in Disaster (MS-VOAD) -
Vice-President (February 2018 – February 2021); and the Mississippi Crisis Response Network
(MCRN) - Board Member At-Large (April 2019 – present).

6.     During Ms. Lightheart's five-and-a-half-year tenure at the Salvation Army
Southern Territory, she received regular performance evaluations. At the conclusion of her initial
ninety (90) days as ALM's Emergency Disaster Services Director, ALM's Divisional Secretary
reviewed Ms. Lightheart's early performance and confirmed she had met or exceeded her job's
requirements. Subsequent to this initial performance evaluation, The Salvation Army conducted
annual standardized performance evaluations of Ms. Lightheart, and in each and every one, Ms.
Lightheart continued to merit ratings of "meets" or "exceeds" expectation for each aspect for
which she was reviewed by her Salvation Army superiors.

7.     Despite Ms. Lightheart's many achievements, Defendants discriminated against
her because of her religion, her gender, and her age, subjected her to repeated harassment, and
retaliated against her when she spoke out by reporting to her superiors multiple employment-
related transgressions, including inappropriate sexual harassment and fraudulent financial
schemes perpetrated by her colleagues, Salvation Army officers, and her superiors.

8.     On February 2, 2021, after nearly six years of impeccable service on behalf of the
organization, The Salvation Army summarily fired Ms. Lightheart.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because
this is a civil action arising under Title VII and other applicable federal laws, statutes, and
regulations.  This court has supplemental jurisdiction over Plaintiff's related claims arising under
state and local laws pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed primarily in the State of Mississippi where this Court is located, 42 U.S.C. § 2000e-5(f)(3); because the relevant employment records are maintained in this District, 42 U.S.C. § 2000e-5(f)(3); because Plaintiff Lightheart worked in this District and would be continuing to work in this District but for Defendants' alleged unlawful employment practices, 42 U.S.C. § 2000e-5(f)(3); because the Salvation Army has a principal office in this District; and because there is no other District that has substantial connection to Ms. Lightheart's claim.

## CONDITIONS PRECEDENT

11.     On July 29, 2021, Ms. Lightheart timely filed with the Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination, reporting acts of religious-based, gender-based, and age-based discrimination against The Salvation Army, as well as claims of sexual harassment and retaliation by The Salvation Army in violation of Title VII. A copy of the Charge of Discrimination is attached hereto as "Exhibit A."

12.     Ms. Lightheart received a Dismissal and Notice of Rights from the EEOC on or about March 8, 2023.  This Complaint has been filed within ninety (90) days of receipt of that EEOC Dismissal and Notice of Rights. A copy of the Right to Sue Letter is attached hereto as "Exhibit B."

13.     Ms. Lightheart has fully complied with all Title VII prerequisites to jurisdiction in this Court.

## PARTIES

14.     Plaintiff Terry Lightheart is a female citizen of the State of Mississippi, and a resident of the Northern Division of the Southern District of Mississippi, residing in Madison

County, Mississippi. She is above the age of eighteen (18) years. As a former employee of The Salvation Army, as defined by Title VII, Ms. Lightheart served as The Salvation Army's Divisional EDS Director for the ALM Division in the Salvation Army USA Southern Territory in Jackson, Mississippi, from August 3, 2015, through February 2, 2021.

15.    Defendant The Salvation Army is an entity subject to suit under 42 U.S.C. §1981, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981a. At all relevant times to this action and upon information and belief, Defendant The Salvation Army is headquartered in London, England, with agents and affiliates registered and qualified to do business in every state in the United States, including the State of Mississippi. The Salvation Army is registered in the State of Mississippi as a Foreign Non-profit Corporation and has been since March 10, 1977. At all relevant times to this action and upon information and belief, Defendant The Salvation Army employed more than fifty (50) employees.

16.    Defendant Salvation Army USA is an entity subject to suit under 42 U.S.C. §1981, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981a. At all relevant times to this action and upon information and belief, Defendant Salvation Army USA is a New Jersey not-for-profit corporation registered and qualified to do business in the State of Virginia with corporate headquarters located in Alexandria, Virginia. At all relevant times to this action and upon information and belief, Defendant Salvation Army USA employed more than fifty (50) employees.

17.    Defendant Salvation Army Southern Territory is an entity subject to suit under 42 U.S.C. §1981, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981a. At all relevant times to this action and upon information and belief, Defendant Salvation Army Southern Territory is a Georgia non-profit corporation with corporate headquarters located in Atlanta, Georgia.

Defendant Salvation Army Southern Territory is registered with the Mississippi Secretary of State as a foreign non-profit corporation conducting business within the State of Mississippi and maintains a principal office in Jackson, Mississippi.  At all relevant times to this action and upon information and belief, Defendant Salvation Army Southern Territory employed more than fifty (50) employees.

18.     Upon information and belief, Defendant Jeff Jellets is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Georgia.

19.     Upon information and belief, Defendant Mark Hunter is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Kentucky.

20.     Upon information and belief, Defendant Kent Davis is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Florida.

21.     Upon information and belief, Defendant Michael Hawley is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Georgia.

22.     Upon information and belief, Defendant Trey Jones is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Alabama.

23.     Upon information and belief, Defendant J. Kevin Smith is a male citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Florida.

24.      Defendant Rule One Consulting, LLC is an entity subject to suit under 42 U.S.C. §1981, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981a. Upon information and belief, Defendant Rule One is a limited liability company registered and qualified to do business in the State of Florida, with its principal place of business located in Land of Lakes, Florida.

25.      Upon information and belief, Defendant Gina Oubre is a female citizen of the United States, above the age of eighteen (18) years, and upon information and belief, resides in the State of Mississippi.

26.      John/Jane Doe #1

27.      John/Jane Doe #2

28.      John/Jane Doe #3

29.      John/Jane Doe #4

30.      John/Jane Doe #5

## BACKGROUND

31.      The Salvation Army functions concomitantly as both a single Protestant Christian church, aligned with the Wesleyan-Holiness movement, and an international charitable organization. It maintains a formal presence and officially operates within 133 countries.

32.      The Salvation Army refers to its members or parishioners as Salvationists and further categorizes its Salvationists as either soldiers[2], adherents[3], or officers.

---

[2] The organization's lay members, local citizens who subscribe allegiance to the doctrines and disciplines of The Salvation Army, are called Soldiers. The Salvation Army requires its converts who desire to become Soldiers to sign "Articles of War" and volunteer their services. These Soldiers are encouraged to accept volunteer responsibilities in the congregation or help in The Salvation Army's social service outreach.

[3] Other members of the congregation are adherents who participate in church activities but have not signed on as Soldiers. Adherents may take on some lay responsibilities.

33.     According to The Salvation Army's website, Salvationists form one single congregation and purportedly number over 1.8 million worldwide.  With fewer than 120,000 proclaimed Salvationist's in the United States, less than 7 percent (7%) of the organization's followers are American citizens.

34.     In addition to operating as a church, The Salvation Army's work encompasses a wide range of social services, including providing food and shelter to the homeless, supporting disaster relief efforts, combating human trafficking, offering addiction rehabilitation programs, and aiding individuals and families in need.

### *HISTORICAL BACKGROUND*

35.     William Booth, a Methodist minister, and his wife Catherine founded the East London Christian Mission, the precursor to what is now The Salvation Army, in 1865 in London, England. Though theologically, the mission or movement deviated from the Booths' Methodist roots, the couple strived to bring Christian salvation to the poor, the destitute, and the hungry.

36.     As the Booths' movement flourished, they reorganized and changed the organization's name from the Christian Mission to The Salvation Army in 1878, just one year prior to spreading the organization's reach to the United States.

37.     With the reorganization and the instillation of a military-like, hierarchical structure, William Booth proclaimed himself to be The Salvation Army's first "General." He served as the General until his death but appointed his son, Bramwell Booth, to follow as his successor.

38.     The Salvation Army, inspired as a metaphor for fighting the injustices of society, adopted a governance structure unique among Christian denominations – it is a top-down

hierarchical construct based on a quasi-military model employing military titles, ranks, and chains of command, replete with mandatory military-style uniforms.

39.     The Booths' focus on ministering to those populations rejected by the traditional churches of the late 19th Century was a key to The Salvation Army's early success.

### TOP-DOWN HIERARCHICAL CONSTRUCT

40.     At the apex of The Salvation Army's global governance structure is its International Headquarters ("IHQ"). IHQ serves as the central coordinating body for the entire organization.

41.     In addition to handling the organization's day-to-day business and the allocation of resources for the entity as a whole, IHQ is responsible for supplying the totality of The Salvation Army with leadership, strategic planning, direction, and long-range forecasting. From London, IHQ supports The Salvation Army's operations worldwide and facilitates its organizational policies across the globe.

42.     In The Salvation Army's effort to manage its global organization, IHQ divided the geographical areas served by The Salvation Army into five ministerial and administrative zones – (a) Africa, (b) the Americas and the Caribbean, (c) Europe, (d) South Asia, and (e) the South Pacific and East Asia.

43.     The Salvation Army further sub-divides these five Zones into Territories. Each Territory has its own territorial headquarters, which reports to IHQ.

44.     As the next subdivision in the hierarchical lineage of The Salvation Army, Territories are usually comprised of a single country or a single politically recognized unit; except, two countries – the United States and India – are larger countries with a numerically strong Salvation Army presence and are, therefore, divided into multiple Territories for

administrative or management convenience. The United States and India are managed by a national headquarters.

45.    A country or political unit served by The Salvation Army must be approved by the General and once approved it is deemed "recognized" by The Salvation Army.  Regardless of a country's or political unit's hierarchical title, its Salvation Army leadership ultimately answers to and reports directly to IHQ.

46.    Territories have been administratively separated into units known as Divisions, and each division has a divisional headquarters.

47.    The Salvation Army further organizes Divisions into Corps, which are the lowest level in The Salvation Army's hierarchy. Corps form the basic or "on the ground" units of the organization. For example, each local Salvation Army church or center is designated as a Corps from which The Salvation Army provides both its religious and social services. Every basic unit or Corps also ultimately answers to IHQ.

48.    It is not uncommon for a group of smaller Corps to be organized into what is referred to as an Area Command.

49.    It remains IHQ to which all units or branches worldwide report.

### _LEADERSHIP IN THE SALVATION ARMY_

50.    The Salvation Army assigns administrative titles to its officers or commissioners who serve as leaders at each level of the organization's governance structure.  These titles include, but are not limited to, General, International Chief of the Staff, International Secretary, Zonal Leader, National Commander, National Secretary, Territorial Commander, Territorial Chief Secretary, Divisional Commander, Divisional General Secretary, Divisional Secretary, Corps Officer, and Area Commander.

51.     The international leader of the corporation known as The Salvation Army is, still today, the General as envisioned by its co-founder, William Booth.

52.     From IHQ, the General leads the organization and directs all of the operations of The Salvation Army throughout the 133 recognized countries within which the organization conducts activities. The General works with and through IHQ's administrative departments to accomplish his or her directives regarding The Salvation Army's global operations.

53.     Since Parliament's passing of The Salvation Army Act in 1931[4], the General is selected by the High Council, a group of nearly two hundred of the corporation's active-duty Commissioners and Territorial Commanders from around the world. He or she typically serves a term of five years that can be extended to seven years.

54.     The General is the only elected position within the Army. All other official leadership positions within the organization are appointed. It is under the General's authority that all appointments are issued and all regulations are dispensed.

55.     The Chief of the Staff is a Salvation Army officer who bears the rank of Commissioner. He is appointed by the General to be The Salvation Army's second-in-command and serves as The Salvation Army's Chief Executive. His function is to implement the General's policy decisions and affect liaison between the IHQ departments. The Chief of the Staff is assisted by The Salvation Army's International Secretaries.

56.     Next in The Salvation Army's chain of command are the International Zonal Leaders. Typically, married Salvationist Commissioners serve together and are appointed jointly to the role of International Zonal Leaders for each Zone. An International Zonal Leader bears the

---

[4] Prior to the passage of The Salvation Army Act of 1931, an outgoing General appointed his successor.

rank of Commissioner, and each of the five Salvation Army ministerial and administrative Zones have appointed International Zonal Leaders.

57.     The Salvation Army tasks each International Zonal Leader with the responsibility of ensuring the Territories within his or her Zone operates effectively. The International Zonal Leaders report to IHQ.

58.     Within the Zones, a Territorial Commander usually holding the rank of Commissioner or Colonel heads each Territory.  The General appoints each Territorial Commander who then reports directly to the General at IHQ, or in the case of the United States and India, to the General at IHQ through the National Commander.

59.     The Territorial Commander is responsible for overseeing the operations of The Salvation Army throughout his or her Territory.

60.     The Territorial Commander is assisted by a Chief Secretary, who has been delegated the responsibility for ecclesiastical and administrative responsibilities for all Salvation Army programs and functions within a Territory, again, usually an entire country. The Chief Secretary is supported by Cabinet Secretaries.

61.     For larger countries divided into multiple sub-territories, the Territorial Commander reports to the National Commander stationed at a national headquarters. The National Commander reports directly to the General at IHQ.

62.     Divisions are headed by a Divisional Commander whose direct report in The Salvation Army's chain of command is the Territorial Commander. A Divisional Commander is usually supported by a Divisional General Secretary and a Divisional Secretary.

63.    Corps are operated by Corps Officers who are Salvation Army officers of a rank ranging from lieutenant to potentially brigadier general.  The Divisional Commander is the direct report for Corps Officers.

64.    An Area Command is operated by a commissioned officer who holds the administrative title of an Area Commander. Like a single Corps Officer, an Area Commander reports to the Divisional Commander.

65.    Corps Officers and Area Commanders bear responsibility for garnering both financial and non-financial support for The Salvation Army's local programs, and each undergoes annual audits conducted by their respective territorial headquarters. Salvation Army leadership at either the national or territorial headquarters may veto a Corps Officer's or Area Commander's decision if it is perceived that his or her action goes against The Salvation Army's mission or if either headquarters deems an action ineffective or not feasible. A copy of The Salvation Army's organizational chart is attached hereto as "Exhibit C."

### OFFICERSHIP IN THE SALVATION ARMY

66.    The ministerial and administrative backbones of The Salvation Army are its officers.  Commissioned officers, holding the military-style ranks of General, Commissioner, Colonel, Lieutenant Colonel, Major, Captain, and Lieutenant, supervise all operations of The Salvation Army. They proclaim the gospel and serve as administrators, teachers, social workers, counselors, youth leaders, and musicians.

67.    Since 1978, all officers are also ordained Salvationist ministers, a title held in addition to their commissions as officers.

68.    Internationally, there are over 26,000 officers, nearly 10,000 of whom are retired and no longer considered to be active officers but remain involved in church services and attend

annual retreats. They are no longer, however, commissioned or assigned to administrative responsibilities unless they are called out of retirement and re-appointed to what are most often temporary assignments.

69.     Commissioned officers are required to wear formal military-style uniforms while conducting official business on behalf of The Salvation Army. This includes wearing the uniform during church services.

70.     Soldiers in The Salvation Army, those who have not attained the status of Officer, are also asked to wear a military-style uniform to church services and have the option to wear the uniform during other times as an outward expression of their commitment to The Salvation Army and its mission.[5]

71.      In most cases, The Salvation Army will consider promoting to Officer those senior Salvation Army Soldiers who agree to satisfy certain strict criteria and complete a required application.

72.     In most instances, those who apply for officer status do so because they are following in the footsteps of other family members. The Salvation Army is an organization that encourages familial involvement and actively strives to be a multi-generation organization comprised of family members spanning a family's living generational lineage – sometimes including the generation of great grandparents down through and involving the grandparent generation, the parent generation, the grandchildren generation, and also the generation of great grandchildren. Such that The Salvation Army might commission a male Officer and later that

---

[5]The Salvation Army's Mission Statement reads, "The Salvation Army, an international movement, is an evangelical part of the universal Christian Church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the Gospel of Jesus Christ and meet human needs in His name without discrimination."

Officer's son and daughter-in-law, their children, their children's children, and even their children, all the way through the male Officer's generation of great grandchildren.

73.     Consequently, unbridled nepotism permeates the ranks of The Salvation Army.

74.     The Salvation Army requires any single Soldier who wishes to marry and to become an Officer, to marry another Soldier who also wishes to obtain officer status. This strict requirement for marriage unions has what is, upon information and belief, the desired consequence of leading Salvationist family members one generation after another to apply for and receive grants of officer status.

75.     A similar rule also applies to any commissioned single officer who wishes to marry. The officer must wed another Salvation Army Officer or forfeit his or her Officer status.

76.     The Salvation Army refers to Soldiers chosen as officer candidates as Cadets. Cadets undergo a two-year course in residence at a Salvation Army training school.

77.     In the United States, each Territory has an officer training school – either a College for Officer Training ("CFOT") or a School for Officer Training ("SFOT").

78.     Training schools fall under the leadership of a commissioned officer holding the administrative title of Training Principal.

79.     A training school's curriculum combines theory and field practice, including Salvation Army doctrine, Salvation Army regulations, sociology and social work, psychology, homiletics, public speaking, Bible studies, church history, composition, community relations, business administration, accounting, and vocal and instrumental music.

80.     After two successful years of training, Cadets are commissioned as Lieutenants, ordained as ministers, and assigned to active duty within the Territory where the training occurred.

81.     Promotion through the officer ranks is based on length of service, character, efficiency, capacity for increased responsibility, devotion to duty, and in many cases, familial ties and the perceived power or authority of an officer's family members.

82.     Regardless of a Salvation Army officer's rank, administrative title, or assigned location, he or she is subject to transfer within the Territory at any given time, though usually transfers occur annually.

83.     Each April or May, The Salvation Army publishes appointment announcements to convey which officers will receive new assigned locations. Most officers will rotate continually for the entirety of their career to other Salvation Army properties within their specified Territory.

84.     Unlike many religious denominations that support their clergy through the tithes of their parishioners, The Salvation Army largely depends on the monetary donations and gifts from the general public to support its officers.[6]

85.     When the general public makes a monetary or in-kind donation, rarely is the public aware they are financially funding an international church, its officers, and their families before any of the donated funds are allocated to the social service and ministerial programs touted by The Salvation Army.

86.     The Salvation Army supplements a Salvation Army officer's salary by providing active commissioned officers and their dependents with housing, including all amenities – furnishings of the officers' choices; professional interior design services; professional interior decorating services; renovation of the officers' residences; costs of all utilities (including cable, telephone, and Internet); expenses related to lawn care and maintenance; automobiles (including

---

[6] The Salvation Army is reported to be the fourth largest charity in the United States with nearly $4 billion in donations in 2022.

the costs of vehicle insurance, fuel, vehicle repairs, and vehicle maintenance); cost of meals (including food stipends); education expenses for the officers and their family members (including all college tuition costs and expenses); clothing allowances; health insurance and medical expenses; monthly allowances in addition to their salaries; any legal assistance and related expenses; travel costs; and expenses related to the officers' participation in Salvation Army retreats.

87.    Additional benefits bestowed upon active Salvation Army officers are debit cards tied to accounts maintained by The Salvation Army, which allow officers to purchase any incidentals, like meals, fuel, supplies, household necessities, and other expenses.

88.    The Salvation Army also provides its inactive officers a full retirement package, inclusive of a cash payout to purchase a home and vehicle, and full health benefits.

89.    The pecuniary benefits that The Salvation Army bestows upon its officers and their families are assistances primarily funded through public gifts and donations or upon information and belief, through the proceeds of the public's gifts and donations which have been scrupulously invested by The Salvation Army, most likely through one of its foundations, trusts, banks, and/or public or private grants.

90.    While the commissioned officers appear to earn a minimal salary, keeping with the appearance of ministerial sacrifice, the minimal salary also allows The Salvation Army officers to enjoy minimal tax consequences, while the officers' and their dependents' material wants and needs are almost wholly supplied by The Salvation Army through one or more of The Salvation Army's foundations, trusts, its bank, public or private grants, or other corporate accounts.

_EMPLOYEES IN THE SALVATION ARMY_

91.    After its governance structure, a second distinctive aspect of The Salvation Army is the nature of its employee composition. The employee pool consists of a unique combination of both non-Salvationists and Salvationists, all of whom are supervised by Salvation Army Officers of varying ranks and who answer to the General who leads from IHQ.

92.    To help compensate for Salvation Army officers' lack of specialized knowledge and experience and to aid in bridging the knowledge gap created by the frequency of officer transfers, The Salvation Army employs workers, including personnel with specialized education and experience, consisting of both non-Salvationists and Salvationists, Soldiers and Adherents. These employees provide a continuity of operations throughout The Salvation Army's branches.

93.    Globally, The Salvation Army employs over 100,000 people. Within the United States there are approximately 40,000 Salvation Army employees, and over one-third of these work in The Salvation Army Southern Territory.

94.    The Salvation Army recruits and hires many non-Salvationist employees because of their highly specialized degrees and their subject-matter-expertise concerning the duties they are hired to perform.

95.    Employees are a vital component of The Salvation Army's operations because they are usually residents and trusted agents in the communities where Salvation Army facilities are located. The frequent transfers of The Salvation Army Officers contribute to the likelihood that the officers are likely to possess minimal knowledge of their assigned geographical areas and few associations in the community outside of The Salvation Army.

96.     The Salvation Army governs its Officers and employees utilizing "Minutes," which are corporate policies and procedures, and an employee handbook, both requiring approval by and/or alignment with IHQ's policies.

97.     Further, all employees must acknowledge they work for an international church and agree to represent the values of The Salvation Army as a Christian organization in their daily tasks.

### *The Salvation Army in the United States*

98.     The Salvation Army's presence in the United States began <u>unofficially</u> in Philadelphia in October 1879. Its <u>officially recognized presence</u> began one year later in March 1880, when General Booth sent a small group of eight Salvationist to New York. By 1902 The Salvation Army was operating throughout the United States.

99.     The Salvation Army has assigned the United States to its "Americas and the Caribbean" Zone, and because of the size, expanse, and population of America, The Salvation Army recognized that as compared to other countries the United States requires more administrative coordination. Thus, The Salvation Army organized the USA into four territories: the <u>Eastern Territory</u>, with headquarters in West Nyack, New York; the <u>Central Territory</u>, with headquarters in Hoffman Estates, Illinois; the <u>Western Territory</u>, with headquarters in Long Beach, California; and the <u>Southern Territory</u>, with headquarters in Atlanta, Georgia. Each territory is under the leadership of a Territorial Commander.

100.     A national headquarters for the United States was later incorporated as The Salvation Army National Corporation ("NHQ"), a religious and charitable corporation. In 1982, The Salvation Army registered as such in the State of New Jersey.

101.    NHQ reports directly to IHQ. It serves as the coordinating body for all nationwide activities of the four Territories and represents The Salvation Army in regard to all matters of national concern.

102.    In 1991, The Salvation Army made the decision to relocate NHQ to Alexandria, Virginia and registered as a foreign not-for-profit corporation qualified to conduct its affairs in the Commonwealth of Virginia.

103.    The functions of The Salvation Army USA are directed by the National Commander, whose office is located at NHQ. The National Commander is the Chairperson of the Board of each of the four USA Territories and he or she reports directly to IHQ. The National Commander is assisted by the National Chief Secretary who acts as second-in-command.

104.    In the United States, nationwide uniformity of policy is the responsibility of the Commissioners' Conference, which is composed of a membership that includes all of the Commissioners serving at NHQ or in any of the territories in the United States, the National Chief Secretary, and the respective USA Territorial Chief Secretaries, who shall have been duly appointed as members of the Commissioners' Conference by the General of The Salvation Army at IHQ in London.

105.    Standing commissions devise and evaluate strategic initiatives to further the mission and ministry of The Salvation Army and then make recommendations to the Commissioners' Conference.

106.    Each of the nation's four Territories is subdivided into Divisions. There are approximately thirty-six (36) Divisions in the United States. A copy of The Salvation Army's USA Organizational Chart is attached hereto as "Exhibit D."

107.    The Salvation Army Southern Territory is comprised of sixteen (16) states[7]

organized into eight Divisions. Alabama, Mississippi, and Louisiana form a single Division with

the ALM Division Headquarters ("DHQ") located in Jackson, Mississippi.

<u>FACTS</u>

108.    Ms. Lightheart began working for The Salvation Army on August 3, 2015. Her

position was a Divisional EDS Director, and upon information and belief, Ms. Lightheart was the

first female Divisional EDS Director hired by The Salvation Army for its ALM Division.

109.    The Salvation Army's "Job Description" for the Divisional EDS Director,

includes a Position Summary that requires that the Divisional EDS Director

> [p]lans, directs, coordinates, monitors, and evaluates the provision of disaster services for the ALM Division; establishes and supervises the maintenance of appropriate inventory of supplies and ensures eh readiness of all disaster equipment; cultivates and maintains relationships with state emergency management and statewide organizations involved in disaster preparedness, response, and recovery; responds to disasters in an organized and timely manner by establishing an Incident Command Post and liaisons with local units and the States of Alabama, Louisiana, and Mississippi; assesses the effectiveness of all services during the disaster and keeps the Divisional leadership abreast to the same; prepares reports during and at the end of the disaster project; oversees the recruitment, training, coordination, and monitoring of Officers, employees and volunteers ensuring ample staff to meet program needs; prepares records and reports regarding the same; assists the Divisional Commander as needed.

A copy of The Salvation Army's Divisional EDS Director's Job Description is attached hereto as

"Exhibit E."

110.    The Salvation Army reviewed Ms. Lightheart's background and determined her

education, training, and experience satisfied its criteria for employment.

---

[7] The Salvation Army USA Southern Territory includes sixteen (16) states – Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia – and the District of Columbia. It is one of the most active of USA Territories from an emergency management perspective.

111.    In fact, The Salvation Army Southern Territorial EDS Coordinator, Defendant Jeff Jellets, was one of five interview panelists involved in the hiring of Ms. Lightheart. Shortly after her onboarding with The Salvation Army, Defendant Jellets expressed to Ms. Lightheart that she was the most qualified EDS Director in all of The Salvation Army Southern Territory.

112.    At the time of her hiring by The Salvation Army and throughout Ms. Lightheart's term of employment, the ALM Division's Director of Human Resources was Defendant Gina Oubre. Upon information and belief, Defendant Oubre has been employed with The Salvation Army for over thirty (30) years.

113.    The Salvation Army's ALM Divisional Secretary served as Ms. Lightheart's direct report.

114.    During her term of employment with The Salvation Army only two commissioned officers held this position. Major William Owens supervised Ms. Lightheart initially upon her commencing her employment and until his retirement in March 2019. Defendant Mark Hunter, who then held The Salvation Army officer rank of Captain, succeeded Major Owens and supervised Ms. Lightheart beginning in March 2019 until The Salvation Army's termination of her employment in February 2021.

115.    Defendant Hunter received his commission as a Salvation Army Officer in June 2007. The Salvation Army promoted him to the rank of "Major" in 2022, after his serving as a Salvation Army commissioned officer for fifteen (15) years.

116.    The Salvation Army's ALM Divisional Commander also served as a superior to Ms. Lightheart and is the ALM Divisional Secretary's direct report.

117.    During Ms. Lightheart's term of employment, three commissioned officers held this position.  Major Ronnie Raymer served from August 2015 to June 2016. Major Steve Morris

served from June 2016 to June 2019, and Defendant Kent Davis, who then held The Salvation Army officer rank of Major, served in the position from June 2019 to February 2021.

118.    Upon information and belief, Defendant Davis received his commission as a Salvation Army officer in 1988. The Salvation Army promoted him to the rank of "Lieutenant Colonel" in 2022.

119.    In addition to her direct supervisors, Ms. Lightheart's position required that she work with all DHQ officers and employees, as well as the ALM Division's Corps Officers, Area Command Officers, and field employees on any matters related to the planning and delivery of emergency and disaster services.

120.    One such Division officer is Defendant Trey Jones who serves as the Area Commander for The Salvation Army in Mobile, Alabama. Defendant Jones was commissioned as a Salvation Army officer in 2012, and currently holds the rank of Captain.

121.    Defendant Jones is an example of a multi-generational officer. He is a fifth-generation officer married to a sixth-generation officer. His in-laws are Commissioners Willis and Barbara Howell, Officers who retired as The Salvation Army Southern Territorial Commanders, overseeing all operations of the Salvation Army Southern Territory. They remained in that post until their retirement in August 2022.

122.    Ms. Lightheart's position also necessitated that she work on a regular basis with the Emergency Services Directors for each of the other seven (7) divisions of the Salvation Army Southern Territory.

123.    Further still, as the Divisional EDS Director, Ms. Lightheart worked on almost a daily basis with Defendant Jellets.

124.    In his position as The Salvation Army Southern Territorial EDS Coordinator, Defendant Jellets makes non-binding recommendations to the eight Salvation Army divisional Emergency Disaster Services Departments in the Salvation Army Southern Territory.

125.    Defendant Jellets' position allowed him some decision-making authority concerning allocations of monies and resources both to and from each divisional Emergency Services Department. Otherwise, as the Territorial EDS Coordinator, Defendant Jellets' position conferred to him no supervisory authority over the divisional EDS directors. He is not a direct report for the divisional EDS Directors, and he does not appear in the divisional EDS Directors' chains of command.

126.    As such, Defendant Jellets held no supervisory authority over Ms. Lightheart in her position as the ALM Divisional EDS Director.  She and Defendant Jellets were colleagues tasked with performing similar functions at different levels within the same organization.

127.    Ms. Lightheart's role as The Salvation Army Emergency Disasters Services Director in non-emergency or "blue skies" conditions involved a critical blend of preparation, communication, education, and leadership.

128.    "Blue skies" periods provided Ms. Lightheart with opportunities to direct focused attention on preparedness measures that could be implemented during emergencies or "gray skies" conditions. "Blue skies" periods also allowed Ms. Lightheart necessary time to secure and coordinate resources; build strategic relationships with Salvation Army officers, employees, volunteers, and local, state, federal, private, and non-profit partners; identify potential threats to Salvation Army facilities and communities within her Division served by the EDS Department, as well as analyze the possible impacts of threats to those facilities and communities.

129.    These are periods during which the EDS Department assesses its storehouse, addresses storage conditions, conducts inventories, identifies shortages, orders supplies and equipment, makes repairs to existing equipment, and re-stocks necessary provisions to ensure the Department has on hand adequate amounts of supplies and equipment to meet emergency and disaster needs when they might be required.

130.    Ms. Lightheart, along with the Salvation Army's partner agencies, took advantage of "blue skies" conditions to collaborate and devise strategies to aid in reducing the negative impacts wrought by emergency and disaster events. "Blue skies" conditions freed Ms. Lightheart and her staff permitting time to conduct and participate in indispensable workshops, hands-on trainings, and response drills to better prepare emergency and disaster relief personnel for potential events. Ms. Lightheart and her staff also used these periods to engage in recovery planning, to ensure that following any emergency situation, The Salvation Army maximized its assistance in helping communities return to a state of normalcy as expediently and as efficiently as possible.

131.    In Emergency Management, when "blue skies" turn to "gray skies," signifying an emergency, all hands are on deck. Immediately before and during "gray skies" the role of Emergency Disaster Services is dynamic and imperative.

132.    As the Director of the ALM Division EDS Department, Ms. Lightheart continually monitored potential threats and prepared alert warnings for distribution among Salvation Army officers, employees, and volunteers. She crafted public information messages and granted media interviews. She conducted coordination calls and prepared reports regarding current and future Salvation Army courses of action during an emergency or disaster incident.

133.    Ms. Lightheart ensured the notification and deployment of the incident command staff and directed the establishment of an incident command post. These coordination efforts required ensuring The Salvation Army had adequate supplies, sufficient numbers of personnel, and the required equipment ready and available to meet the needs of the affected area. For The Salvation Army's role as an Emergency Responder, Ms. Lightheart had to coordinate with others to ensure the organization had what was necessary to provide food, emotional and spiritual care, donations management, social services, and in some cases, emergency communications.

134.    For emergency and disaster incidents occurring within the ALM Division, Ms. Lightheart played an integral role in identifying, coordinating, collecting, and communicating full Situational Awareness. Situational Awareness is the ability to identify, process, and comprehend the critical information about an incident. It is knowing what is happening on the ground regarding an emergency or disaster event as close to real time as might be feasible. Situational Awareness requires continuous monitoring of relevant sources of information regarding actual incidents and any developing hazards.

135.    A common core function of an emergency operation center or an incident command center is gaining, maintaining, and sharing Situational Awareness and developing a Situational Report ("SitRep") that is shared among responding participants in an emergency or disaster incident. Situational Awareness is particularly important in the early stages of an emergency activation because accurate, timely information will enable more informed, effective decision-making concerning all response efforts and limit responders' unnecessary exposure to continuing harm.

136.    Depending on the nature of the emergency or disaster threat, Ms. Lightheart would determine the need for evacuation from Salvation Army facilities. Her overarching goal

during a disaster was to work effectively with partner agencies to prevent harm to people, to minimize the damage to property, and to facilitate the recovery process swiftly and efficiently once the immediate crisis has passed.

137.    Ms. Lightheart's duties included everything from mobilizing resources and managing emergency aid to making critical decisions based on evolving situations. She and her staff were a vital communication link, providing regular updates both about the emergency or disaster and the management of the incident to the public, local authorities, the media, and most importantly, The Salvation Army leadership at the local, divisional, territorial, and national levels.

138.    Overtime hours for Salvation Army EDS personnel, especially in the ALM Division, is frequent. Disasters are not constrained by regular business hours; they strike-at-all times and persist for days, weeks, or longer. During all-hands-on-deck "gray skies" events, it is common for an average EDS workday, and the ALM Division EDS Department was no exception, to extend well beyond the average eight (8) hours, sometimes as much as sixteen (16) hours or more. Effectively addressing and responding to emergency and disaster incidents requires The Salvation Army's EDS personnel to work whatever schedule is necessary often with few breaks in intense situations mandating constant attention and quick decision making. In essence, The Salvation Army's EDS personnel are on-call around the clock – twenty-four (24) hours a day, seven (7) days a week.

139.    Local and state emergency operation centers ("EOCs") are the hub for all disaster relief coordination efforts. It is important for The Salvation Army's EDS personnel to be staged at appropriate EOCs to ensure effective communication with stakeholders. In order to meet its mission of providing disaster relief, including food, emotional and spiritual care, social services,

donations management, and at times, emergency communications, Salvation Army EDS personnel are needed to coordinate response efforts, make critical decisions, communicate with stakeholders, and manage resources around the clock during an incident. Even after the immediate crisis is over, the recovery phase can require extensive hours as Salvation Army EDS personnel perform their tasks to restore the community.

140.     For instance, the year 2020 experienced an unprecedented number of federally declared emergencies and major disasters in the ALM Division requiring Ms. Lightheart, as The Salvation Army's ALM Division EDS Director, to work in excess of 1,500 hours of overtime. Though the number of hours of overtime worked by Ms. Lightheart may have been greater in 2020 due to the volume of incidents, overtime requirements were part of her position from the moment she became employed by The Salvation Army.

141.     This is also true of Ms. Lightheart's staff and all of The Salvation Army's EDS Directors and their respective personnel. Where there are emergency and disaster events to which The Salvation Army deploys a response, overtime is a necessary and expected component of the emergency responders' jobs.

142.     From the beginning of her employment with The Salvation Army in 2015, severe weather occurred almost weekly somewhere in the ALM Division, but the numbers of emergency and disaster incidents increased in 2019 and 2020 as compared to previous years.

143.     The years 2019 and 2020 were especially challenging for the ALM Division's Emergency Services Department. For instance, in 2019, nine (9) federally declared disasters across the Division's three states compelled emergency responses from Ms. Lightheart and her staff, and 2020 would see twenty-two (22) federally declared disasters.

144.    Then, in March 2019, Ms. Lightheart lost one-third of her personnel when The Salvation Army mandated the termination of long-time EDS employee William "Bill" Feist, eerily close to his declared retirement. The ALM Division EDS Department was at that time comprised of Ms. Lightheart and two employees. With the unexpected and unwarranted departure of Mr. Feist, Ms. Lightheart was left to address all of her department's demands with a single employee.

145.    Major Owens and Defendant Oubre informed Ms. Lightheart that Mr. Feist's termination was unavoidable because there were no funds left in the Department's budget from which to compensate Mr. Feist. Ms. Lightheart learned there was a purported "financial crisis" within the ALM Division's Emergency Services Department, a situation that was incongruent with her understanding that she and her department had available to it approximately $2.4 million in disaster reserves.

146.    More particularly, Salvation Army personnel had previously confirmed to Ms. Lightheart that she and her department had available to it approximately $2.4 million in disaster reserves. This represented monies donated to The Salvation Army during Hurricane Katrina for the benefit of ALM Division emergency and disaster services but monies that had not been utilized by her department in the delivery of disaster services; therefore, these funds were deposited at THQ for the benefit of and use by the ALM Division's Emergency Services Department.

147.    Though these reserve funds were allegedly held at THQ for the benefit of the ALM Division's Emergency Services Department, confusion seemed to exist within The Salvation Army regarding the existence of the $2.4 million in disaster reserves as well as Ms. Lightheart's ability to access those funds for use by her department.

148.     Unlike other disaster services departments in the Salvation Army Southern
Territory, The Salvation Army restricted Ms. Lightheart's access to or use of the funds or use by
the department for disaster related expenditures. The Salvation Army's unparalleled restrictions
of use of the funds created the ALM Division EDS Department budgetary shortfall and the
alleged necessity to terminate Mr. Feist.

149.     The reason provided for Mr. Feist's termination – a lack of money – is
implausible given the ALM Division EDS Department had at least $2.4 million in reserves at
THQ for the department's use, and the funds should have been available to continue to pay Mr.
Feist's salary. Defendant Jellets' statements about Mr. Feists being antiquated and beyond
improvement strongly suggests the undisclosed reason for The Salvation Army's termination of
Mr. Feist was his age. The timing of Mr. Feist's termination so close to his retirement is also
suspicious.

150.     The fact that age was the underlying reason for The Salvation Army's termination
of Mr. Feist is further supported by the fact that like Mr. Feist, The Salvation Army terminated
two female employees in the ALM Division who, were both relieved of their positions
immediately prior to their retirement after decades of employment with The Salvation Army.

151.     After May 2019, Ms. Lightheart was left with one employee and an inability to
replace Mr. Feist. The Salvation Army informed Ms. Lightheart that the EDS Department's
financial crisis made it impossible to replace Mr. Feist leaving Ms. Lightheart woefully
shorthanded.

152.     In March 2020, the ALM Division EDS Department, along with the entire nation,
witnessed the outbreak of what would become the COVID-19 pandemic. In addition to
responding to each of the 2020 emergency and disaster events, Ms. Lightheart and her staff of

one were required to respond to the record number of emergency and disaster events across three states amid the challenges of newly mandated pandemic restrictions such as social distancing, isolating, and quarantines.

153.    Ms. Lightheart's department was regularly called upon to address large numbers of emergencies, typically more than many of her sister divisions, but The Salvation Army required Ms. Lightheart and the ALM Division Emergency Disaster Services Department to perform its duties with the reduced number of employees.

154.    This period of 2019 and 2020 also witnessed the retirement of Ms. Lightheart's direct supervisor, Major William Owens and the appointment of a new supervisor, Captain Mark Hunter; the appointment of a new Divisional Commander, Major Kent Davis; Ms. Lightheart's discovery of misappropriated and misallocated disaster funds; and the misconduct and removal of four sets of commissioned Officers within the ALM Division.

155.    Adding still more to the challenges of this time period were the harassing behaviors by Defendants Jellets, Hunter, and Jones to which Ms. Lightheart was subjected.

156.    Notwithstanding the many challenges with which she was presented, Ms. Lightheart continued to perform her daily job duties above expectations throughout her employment and until her termination; however, in addition to satisfying the day-to-day requirements of the ALM Division's EDS Director, she also accepted additional external leadership roles on behalf of The Salvation Army, including deploying on 14-day assignments to assist other Divisions in The Salvation Army Southern Territory. When requested, Ms. Lightheart also accepted additional tasks such as facilitating courses at The Salvation Army Southern Territory Emergency Disaster Services Conferences and co-writing the Salvation Army emergency disaster services course, SA-170 - All-Hazards Facilities Preparedness Planning.

157.    Between 2015 and 2018, Ms. Lightheart served three disaster relief deployments as a State Liaison Officer representing The Salvation Army in Mississippi's Emergency Operations Center.

158.    Ms. Lightheart also assisted in the South Carolina Flood of 2015, the West Virginia Flood of 2016, and North Carolina's Hurricane Florence in 2018. Ms. Lightheart completed another 14-day disaster deployment to Albany, Georgia for Hurricane Florence serving as The Salvation Army's Planning Section Chief. This occurred immediately following her North Carolina deployment.

159.    Ms. Lightheart is a respected subject-matter-expert in the field of Emergency Management, and she often acted as a spokesperson for The Salvation Army during emergencies, providing interviews to local and national media outlets such as Fox News and The Weather Channel.

160.    Ms. Lightheart regularly appeared on the program at the Annual International Association of Emergency Managers (IAEM) conferences. These conferences are held in various locations throughout the United States, and Ms. Lightheart received requests to present or speak regularly as part of her role as Chairperson of the various committees to which she was appointed.

161.    Her reputation, experience, professionalism, and position garnered Ms. Lightheart inclusion in state and local government emergency preparedness and response planning meetings facilitated by states, government subdivisions, and other governmental agencies in which governors, lieutenant governors, and other high-profile local, state, and federal leaders participated. For these individuals, Ms. Lightheart often provided verbal and written reports

addressing The Salvation Army's EDS related activities, which were utilized, in part, to determine plans of action.

162.    Prior to Ms. Lightheart's employment she had little knowledge of The Salvation Army's operations. She was only distantly familiar with The Salvation Army's annual bell ringing program and its work in emergency disaster services. In fact, prior to becoming employed with The Salvation Army, Ms. Lightheart had met and interacted with Mr. Feist in his role as the ALM Division Emergency Disaster Services Liaison. Mr. Feist was a member of the Mississippi Governor's Active Shooter Task Force of which Ms. Lightheart served as Chair.

163.    Within the first few months of Ms. Lightheart's employment she began witnessing and experiencing a toxic culture within The Salvation Army. A facet of the toxic culture is evidenced by conduct involving commissioned officers who intentionally and openly disregarded the organization's established policies and procedures while simultaneously holding non-officers, including both soldiers, adherents, and employees, accountable for violations of those same policies and procedures. Upon information and belief, the toxic culture flourished, in part, because of the nepotism existing among its ranks.

164.    As time passed, it became clear to Ms. Lightheart that others in the organization recognized and disdained the toxic culture. Non-officers comprised of Salvationist soldiers and adherents and non-Salvationist employees referenced the existence of the negative culture and spoke about different symptoms it elicited.

165.    While facilitating territorial disaster planning meetings with the EDS Directors and EDS staffs, Defendant Jellets, a non-officer and non-Salvationist who has been employed by The Salvation Army for over twenty (20) years, often spoke openly and publicly of The

Salvation Army's officers' misconduct. This is especially true of their misconduct related to financial misappropriation and misallocations.

166.    Upon information and belief, The Salvation Army empowered Mr. Jellets and his objectionable conduct, likely because of his in-depth knowledge of Salvation Army officers' misdeeds gleaned by him from his two decades of exposure to the officers' misconduct.

167.    Upon information and belief, this sense of empowerment buoyed Defendant Jellets' feelings of security concerning his position and ultimately, allowed Defendant Jellets' own misdeeds to be perpetuated against Ms. Lightheart without any repercussion to him.

168.    Similarly, Defendant Oubre, another non-officer and non-Salvationist employee who has been employed by The Salvation Army for over thirty (30) years, is also knowledgable of The Salvation Army's commissioned officers' attempts to circumvent and disregard policies and procedures for their personal benefit. Upon information and belief, The Salvation Army also seems to empower Defendant Oubre, similarly because of her in-depth knowledge of the officers' misdeeds gleaned from her three decades of exposure to the officers' misconduct.

169.    Despite her knowledge of the toxic culture existing within The Salvation Army and the perpetuation of that culture by Salvation Army Officers, too often resulting in harm to employees, Defendant Oubre seemed to default to prioritizing officers' wishes and desires, regardless of the propriety of those wishes and desires, over the wellbeing of any non-Salvationist employee.

170.    For instance, Defendant Oubre supported an annual practice by the Officers of requesting monetary gifts from employees during the Christmas holidays and other occasions, such as retirements. Donations from workers for the benefit of their Salvationist officer superiors were requested, notwithstanding the fact that all material needs and many desires were already

being met by The Salvation Army through donations and proceeds of those donations made by the public  Although this practice was stated to be a "voluntary donation," cards were circulated for the signing by those who contributed, leaving those employees who had not participated open to potential judgment, ridicule, and ill treatment by their Salvationist superiors.

171.    Ms. Lightheart discovered Defendant Oubre was also prone to violate The Salvation Army's practices, procedures, and protocols.

172.    In one instance, Defendant Oubre attempted to prevent a different Division's hiring of a former ALM Division employee. Upon information and belief, Defendant Oubre, as the organization's Divisional Human Resources Director, intentionally violated procedures to further a personal vendetta. Her misconduct succeeded in thwarting the employment of a deserving and qualified candidate by another Division who considered the candidate to also be both deserving and qualified.

173.    Defendant Oubre contacted the hiring authority directly with the specific intent to block the candidate's application from progressing through the hiring process. Defendant Oubre succeeded. The hiring Division removed the candidate from consideration.

174.    Shortly after Ms. Lightheart began her employment with The Salvation Army in August 2015, Defendant Jellets strongly urged Ms. Lightheart to terminate both of her department's two employees, Bill Feist and Ken Freeman. This would have equated to the firing of her entire department's personnel shortly after assuming the Director's position.

175.    Because Defendant Jellets held no authority over Ms. Lightheart, he was limited to "suggesting" she terminate both of her employees, but Defendant Jellets did, in fact, strongly advocate for Ms. Lightheart's termination of both Mr. Feist and Mr. Freeman.

176.    Defendant Jellets supported his position to terminate Mr. Feist by stating, in part, that Mr. Feist's ideas were antiquated. At the time, Mr. Feist had been a Salvation Army employee for nearly twenty (20) years, and as a Salvationist volunteer, Mr. Feist had served in numerous volunteer capacities assisting The Salvation Army in its delivery of services.  Ms. Lightheart observed that Mr. Feist was well respected among The Salvation Army's partner organizations and agencies.

177.    There was one minor transgression in Mr. Feist's job performance. While serving in the role of the ALM Division EDS Director prior to Ms. Lightheart's arrival at The Salvation Army, Mr. Feist had an emotional outburst in front of ALM Division officers, including the Divisional Commander, and his direct supervisor. The outburst consisted of yelling, cursing, and pounding a table with his fist. The Salvation Army disciplined Mr. Feist by changing his job title from EDS Director to a newly formed position called the EDS Department Liaison.  Although his title changed, his salary and benefits remained the same.

178.    Despite the fact both Mr. Feist and Mr. Freeman consistently received meets or exceeds expectations on their annual performance reviews, Defendant Jellets opined he did not believe their skills could be further developed. A conversation with Defendant Oubre revealed to Ms. Lightheart that the real reason Defendants Jellets and Oubre advocated for Mr. Freeman's termination had more to do with Mr. Freeman's physical appearance than any job-related deficiencies.

179.    According to Defendant Jellets, both employees would hold Ms. Lightheart back from "growing the department."  Over the course of time, however, Ms. Lightheart realized it would be Defendant Jellets and Defendant Oubre who would keep Ms. Lightheart from growing

her department, not the two employees whose termination Defendant Jellets so strongly advocated.

180.    There were numerous ways that Defendant Jellets contributed to Ms. Lightheart's departmental challenges, and upon information and belief, one of the motivations for Defendant Jellets actions was Ms. Lightheart's refusal to act on Defendant Jellets' recommendation that she fire both Mr. Feist and Mr. Freeman. Ms. Lightheart, learned over time that The Salvation Army's empowerment of Defendant Jellets led him to expect to receive those things for which he asked, including the termination of Ms. Lightheart's entire staff when he asked her to terminate those employees.

181.    After working directly with Mr. Feist and Mr. Freeman every day, day-in and day-out, Ms. Lightheart found both employees to be experienced, knowledgeable, and dedicated personnel.  Ms. Lightheart exercised the prerogative afforded to her by her position and elected to disregard what she had determined to be Defendant Jellets' unfounded recommendations.

182.    When Ms. Lightheart refused to acquiesce to the demand of Defendant Jellets and refrained, instead, from terminating Mr. Feist and Mr. Freeman, upon information and belief, Defendant Jellets's animus toward Ms. Lightheart began to grow, and he adopted a different course of action to achieve his objectives.

183.    In late 2016, Ms. Lightheart and Mr. Freeman attended a meeting to discuss the 2016 Louisiana Flood Event. Defendant Jellets requested the meeting, and those in attendance included Defendant Jellets, his subordinate Bobbi Geery, Ms. Lightheart, Mr. Freeman, Defendant Oubre, Major Owens, and Michelle Faulkner, ALM Division's Finance Director. Mr. Feist was not in attendance due to other obligations. The stated purpose of the meeting was to discuss the ALM Division EDS Department's response to the 2016 Louisiana flood event and the

support it received from the Southern Territory Disaster Services Department and other Divisions.

184.    The meeting's discussion revealed no unexpected breaches in the ALM Division EDS Department's delivery of disaster services or its coordination with other Divisions. Although the meeting was not the proper forum for reprimands, Defendant Jellets recommended to Defendant Oubre and Major Owens that Ms. Lightheart be required to place Mr. Freeman on a Performance Improvement Plan, a form of disciplinary action which if not completed successfully would result in job termination.

185.    Mr. Freeman was being subjected to sanctions for two practices that were not originally part of his job description, for actions that he was told by superiors he would not be required to complete, and/or for omissions that were widespread across the Salvation Army Southern Territory's divisional EDS departments. The two practices at issue included an expectation that training coordinators frequently update and maintain the national emergency disaster services database and the expectation that EDS employees would obtain certification through the International Association of Emergency Management at least as an Associate Emergency Manager (AEM) within two years of their hiring.

186.    Ms. Lightheart was aggrieved to learn Mr. Freeman was the only staff member in the Salvation Army Southern Territory to receive disciplinary action for omissions accepted in the other Divisions within the Territory. Based on information and belief, Defendants Jellets and Oubre had not requested sanctions against any other EDS staff personnel for similar or the same practice omissions.  What was of significant concern to Ms. Lightheart was the stated reason for the disciplinary action and the fact that Defendant Jellets and Oubre appeared to be unfairly focused on Mr. Freeman.

187.    Defendant Oubre instructed Ms. Lightheart to do as Defendant Jellets had requested. Upon information and belief, due to their long-time acquaintance and what seemed their shared desire for the termination of Mr. Freeman and/or to harass Ms. Lightheart, Defendants Jellets and Oubre seemed to act jointly to employ this unwarranted disciplinary tactic in hopes that Mr. Freeman might be so offended by the gratuitous discipline that he would resign.

188.    Alternatively, and upon information and belief, Defendants Jellets and Oubre knew that by implementing this disciplinary scheme, should Mr. Freeman elect to remain in the employ of The Salvation Army and commit to their improvement plan, then Defendants Jellets and Oubre would have justification on their own to require the termination of Mr. Freeman should he somehow fail to comply with the obligations established in the Performance Improvement Plan.

189.    As Mr. Freeman's direct supervisor, Ms. Lightheart neither witnessed nor learned of any act or omission by Mr. Freeman that warranted the requested disciplinary action. Mr. Freeman's previous performance reviews further supported Ms. Lightheart's experience in that they failed to identify any deficiencies in Mr. Freeman's performance of his job or omissions of any job-related requirement. In fact, since the beginning of Mr. Freeman's employment in August 2012, all of his annual reviews resulted in ratings that he had met or exceeded his job expectations. In the one review of Mr. Freeman that Ms. Lightheart completed as his supervisor prior to the 2016 meeting, she, too, found his job performance met or exceeded expectations.

190.    During Ms. Lightheart's supervision of Mr. Freeman, she found him to be an invaluable asset to The Salvation Army, in part due to his diverse employment background

which included, on one hand, his prior experience working with the Federal Emergency Management Agency and on another, his past experience as an entrepreneur and business owner.

191.    These roles previously held by Mr. Freeman afforded him the unique ability to excel in areas that are part of his Salvation Army position, such as effectively and efficiently procuring, storing, and moving supplies; building close relationships with vendors; negotiating contracts and advantageous pricing; operating a semi-tractor and trailer; navigating difficult situations regarding supply chains; addressing a plethora of mechanical issues; and maintaining Salvation Army facilities. The termination of Mr. Freeman would have been exceedingly detrimental to Ms. Lightheart, the EDS Department, and The Salvation Army for reasons that include the loss of institutional knowledge, the loss of external relationships, a certain delay in emergency services, and the additional expenses resulting from lost contracts.

192.    Defendant Jellets retaliated further against Ms. Lightheart during a telephone call in August or September 2017 during an ongoing emergency incident after he instructed Mr. Feist to have Ms. Lightheart call him.  When Ms. Lightheart made the call to Defendant Jellets as instructed, Defendant Jellets lashed out at Ms. Lightheart and proceeded to berate and harass Ms. Lightheart for allowing Mr. Feist to contact him directly.  Defendant Jellets accused Ms. Lightheart of allowing Mr. Feist to break The Salvation Army's chain of command by permitting him to contact Defendant Jellets directly.

193.    In addition to working in the employ of The Salvation Army in the ALM Division EDS Department, Mr. Feist was also a Salvationist volunteer, outside of and external to his employment. Though Ms. Lightheart served as Mr. Feist's direct report as an employee, she held no supervisory authority over him in his volunteer role.  As a volunteer, Mr. Feist served as the Coordinator of The Salvation Army Team Emergency Radio Network (SATERN).

194.    In his volunteer role, Mr. Feist telephoned Mr. Jellets as was appropriate to discuss, arrange, and manage the deployment of a communications trailer from Mississippi to Florida. Upon hearing Mr. Feist's voice, Defendant Jellets proceeded to loudly proclaim he was not to call him directly and demanded that Mr. Feist have Ms. Lightheart telephone Defendant Jellets.

195.    Because disaster relief operations were an ongoing priority, Ms. Lightheart worked to calm Defendant Jellets and move beyond his harassing conduct. Once the call concluded, however, Ms. Lightheart immediately reported Defendant Jellets' offensive, inappropriate, and unprofessional behavior to her direct supervisor, but The Salvation Army failed to take any disciplinary action against Defendant Jellets.

196.    Defendant Jellets' animosity toward Ms. Lightheart was further demonstrated in even more costly ways.  One example is his intentional failure to exercise his authority as the Southern Territorial EDS Coordinator to ensure the ALM Division EDS Department had full access to its disaster reserve funds held at THQ as prescribed by The Salvation Army's policies and procedures.

197.    As a territorial disaster coordinator, Defendant Jellets maintains a responsibility to assist divisional EDS departments in obtaining the necessary resources to carry out their operations, especially when resource gaps are identified.

198.    Defendant Jellets is aware that The Salvation Army's EDS departments operate almost exclusively on monetary and in-kind donations from public and private donors. He is also aware that when an EDS department, like Ms. Lightheart's department, is restricted from accessing funds donated by the public for the benefit of a department, such as the ALM Division EDS Department, the department's inability to use those funds detrimentally impact the

distressed department preventing it from delivering its services and impedes its director, someone such as Ms. Lightheart, from performing her obligatory functions.

199.    Ms. Lightheart's restrictions on the use of the financial reserves slated for her department were so severe that The Salvation Army denied a request to purchase a $400.00 pallet jack for the disaster warehouse.

200.    Ms. Lightheart's restrictions included travel. On one occasion, a territorial meeting was called and attended by Defendant Jellets and all other Divisional EDS Directors and their staffs. Ms. Lightheart was the only EDS Director in the Salvation Army Southern Territory not in attendance because The Salvation Army denied her travel request to attend the meeting. Superiors denied her travel request allegedly because of her department's financial crisis, notwithstanding the fact there was supposed to be $2.4 million in reserves earmarked for her department and held at THQ.

201.    Other examples of financial restrictions imposed upon Ms. Lightheart and her staff due to the purported budgetary shortfall include the denial of annual salary increases; the cancellation of scheduled regional disaster training sessions vital in preparing disaster personnel to deploy to disaster relief operations; and the rescinding of disaster vehicles assigned to EDS staff as part of the EDS Department's employee benefit package.

202.    Ms. Lightheart soon learned that no other Division was experiencing a "financial crisis." Further, she also discovered that no other EDS Director in the Salvation Army Southern Territory had been restricted or constrained in any way from accessing his or her department's disaster reserve funds held at THQ and managed or monitored by Defendant Jellets. In fact, other EDS Directors were reporting the purchase of costly equipment necessary for deployment in response to emergencies, the hiring of additional personnel, the approval for travel, and the

hosting, facilitation, and provision of disaster and emergency training, all of which had been denied to Ms. Lightheart and her department.

203.    Less than four (4) months after Mr. Feist's termination and while the EDS Department remained in the midst of its purported financial crisis, Defendants Hawley and Davis requisitioned seventy-two (72) pop-up tents to be used by the ALM Division Social Services Department for non-disaster related activities.  Although the Social Services Department has its own budget, Defendants Hawley and Davis did not request the purchase of the tents be made from the Social Services Department budget, but rather, they requested the purchase to be made from the EDS Department budget, a budget that was in such a critical shortfall that it was necessary to terminate a twenty-year employee on the eve of his retirement.

204.    Requesting the EDS Department purchase the non-disaster related items with disaster reserve funds violated The Salvation Army's policies and procedures, constituted a misappropriation of disaster reserve funds, and amounted to a fraudulent use of public donations.

205.    Mr. Jellets demonstrated his authority and control over the ALM Division EDS Department's disaster reserve funds, again, funds Ms. Lightheart was prevented from using, even to save Mr. Feist from termination. Defendant Jellets joined Defendants Hawley and Davis and authorized the purchase from the ALM Division EDS Department's disaster reserve funds, committing what is upon information and belief a misappropriation of the monies.

206.    Upon discovering Defendants Hawley and Davis's efforts, Ms. Lightheart attempted to prevent the misappropriation of funds by expressing to her direct supervisor, Defendant Hunter, her concern that the funds were being misappropriated. Ms. Lightheart also alerted Defendant Jellets that Defendants Hawley and Davis had fabricated a disaster-related

purpose for the purchase when, in fact, the tents were to be used for the convenience of another department and for other than disaster services.

207.     Unbeknownst to Ms. Lightheart, Defendant Jellets approved the purchase over her objection. The tent purchase was charged to the ALM Division EDS Department disaster reserve account and shipped directly to Major Hawley at Divisional Headquarters. The ALM Division EDS Department never received the tents nor were the tents ever added to the ALM Division EDS Department inventory. This was in complete violation of The Salvation Army's accounting and auditing practices.

208.     Approximately one month later, Ms. Lightheart saw the charge for the tents on her department's monthly accounting report. Immediately, she contacted Defendant Jellets via email to, again, express her concerns. She hoped Defendant Jellets would, at a minimum, reverse the charge and apply the tent purchase to the correct departmental budget.  Defendant Jellets never replied to Ms. Lightheart's email.

209.     During this timeframe, approximately six months after Mr. Feist's termination, Ms. Lightheart learned of the misappropriation and misallocation of other monies – over $2 million collected from public and private donors during the 2016 Louisiana Flood and the 2017 Winter Tornado in Hattiesburg, Mississippi.

210.     Upon information and belief, these acts of misconduct were fraudulent uses of public donations by The Salvation Army.

211.     Though The Salvation Army had the opportunity to correct these transgressions committed by Salvation Army officers, upon information and belief, it elected not to do so.

212.     Upon discovering other misappropriations of ALM Division EDS Department donations, Ms. Lightheart, again, immediately communicated with her superiors and Defendant

Jellets. She expressed her concerns about these issues and questioned why The Salvation Army would allow such misappropriations without acting to correct the wrongdoing and without repercussions to the wrongdoers. Once again, neither her superiors nor Defendant Jellets responded to Ms. Lightheart's entreaties.

213.    After Mr. Feist's termination, it became necessary for the ALM Division Human Resources Department working with the USA Southern Territory Human Resources Department to revise Ms. Lightheart's and Mr. Freeman's job descriptions to absorb and redistribute what had been Mr. Feist's employment-related duties and obligations.

214.    Plaintiff Lightheart used the opportunity to recommend and request that Mr. Freeman's title be changed from Training/Logistics Coordinator to Emergency Services Manager.  The change in job title would not require a change in Mr. Freeman's salary or benefits.  Ms. Lightheart submitted her request to Defendant Oubre.

215.    Plaintiff Lightheart made the request, in part, because Mr. Freeman had originally been hired in 2012 as the ALM Division EDS Assistant Director.  His title had been changed, but Ms. Lightheart knew the suggested title or titles similar in nature were being assigned to and/or employed by other EDS staff in the Salvation Army Southern Territory, including Defendant Jellets' employee, Tyra Gore.

216.    Defendant Oubre denied Ms. Lightheart's request, justifying the denial on the basis that the requested title was not supported in the Territory.  Contrary to Defendant Oubre's representations and as evidenced by the title held by Defendants Jellets' own employee, The Salvation Army permitted other Divisions to fill positions with the recommended title or titles similar in nature to that of Emergency Services Manager.

217.    Ms. Lightheart questioned Defendant Oubre's decision and was informed by Ms. Oubre's employee, Julie Pate, that the ALM Division's Human Resources Department had communicated with Defendant Jellets regarding the change in title. Based on Defendant Oubre's denial and upon information and belief, it appears evident that Defendant Jellets did not express support for the change.

218.    Defendant Jellets and Oubre's lack of support for and denial of Mr. Freeman's change in title represented what seemed another instance of Defendant Jellets' animosity toward Ms. Lightheart, given the fact it was public knowledge he had supported other EDS Directors in their efforts to bestow similar titles upon members of their staffs. At a minimum, Defendants Oubre and Jellets' denial of Ms. Lightheart's request served as example of a double standard adopted by these defendants since Ms. Lightheart was not afforded the same support or courtesy as other EDS Directors. Furthermore, Defendants Oubre and Jellets' denial was another attempt to frustrate Mr. Freeman and encourage his departure.

219.    In August 2020, Defendant Jellets engaged in another verbal attack upon Ms. Lightheart.

220.    This crushing attack came on August 27, 2020, during the course of a national EDS coordination call related to Hurricane Laura. Defendant Jellets' acrimony for Ms. Lightheart could neither be disguised nor misinterpreted.

221.    During the call Defendant Jellets began verbally attacking and openly harassing Ms. Lightheart while making unwarranted demands of her within the hearing of everyone on the call.  Participants included Ms. Lightheart's peers, other employees, Salvation Army officers, and some of Ms. Lightheart's direct superiors. Though Defendant Jellets' attack upon Ms. Lightheart was relentless, his interaction with her male EDS counterparts on the call was

diametrically opposed to the rancor he demonstrated for Ms. Lightheart. The Salvation Army failed to reprimand or correct Defendant Jellets for his offensive and inappropriate public behavior toward Ms. Lightheart.

222.    Beginning with the preparations for Hurricane Laura on approximately August 20, 2020, and throughout the weeks that followed her landfall in Cameron, Louisiana, the ALM Division EDS Department led the efforts to respond to the disaster and provide emergency disaster services.  As the leader of the accountable department, Ms. Lightheart had responsibility for coordinating response efforts undertaken by The Salvation Army.

223.    Per The Salvation Army's protocol, Ms. Lightheart was to have served as her Division's Point of Contact with THQ, in relation to the preparation for, response to, and delivery of emergency disaster services.  Communications with THQ regarding updates, needs, efforts, and the like were all part of Ms. Lightheart's responsibility.

224.    Plaintiff Lightheart learned inadvertently on August 30, 2020, Defendant Jellets had been excluding her from communications he was having with her Division regarding the hurricane and its aftermath in direct contradiction of The Salvation Army's policies and protocol.

225.    One example involves a daily morning operational briefing call between Defendant Jellets and Ms. Lightheart's supervisor Defendant Hunter. Rather than include Ms. Lightheart, the ALM Division EDS Director, as the recognized Point of Contact for the ALM Division on the daily calls, as required by organizational protocol, Defendant Jellets communicated instead directly with Defendant Hunter. Then, Defendants Jellets and Hunter intentionally excluded Ms. Lightheart from these morning briefings regarding the Division's disaster relief operations. Once her exclusion was discovered, Ms. Lightheart requested to be

included in the daily meetings, but neither Defendant Jellets nor Defendant Hunter ever provided

her with the necessary information to join the calls.

226.    By excluding Ms. Lightheart from the calls, Defendants Hunter and Jellets openly

violated The Salvation Army's written procedures and widely accepted practices continuing the

oppressive behaviors directed at Ms. Lightheart.

227.    Aggravating Defendant Jellets' and Hunter's behavior was the fact Ms. Lightheart

was required to work with a problematic fifth generation Salvation Army Officer, Captain Trey

Jones, who was also a newly appointed ALM Division Area Commander and the son-in-law of

the Southern Territorial Commander. In addition, Defendant Jones is a friend of then ALM

Divisional Commander, Defendant Davis. Defendant Jones received an appointment to serve as

the Hurricane Laura Incident Commander in Lake Charles, Louisiana.

228.    During Defendant Jones' fourteen-day deployment to Lake Charles, he

disregarded established safety protocols and abused his position by racing a Salvation Army all-

terrain vehicle assigned for disaster services on a public street and allowing his fellow officers to

do the same; he disparaged a partner organization's leader by inappropriately commenting on the

organization's leader's advanced age; he exhibited an overly strict and harsh leadership style

with his disaster team members who were assigned to the emergency relief operations causing a

significant decline in team morale; he and Defendant Davis publicly ignored the State of

Louisiana's and ALM Division's COVID-19 mask mandate; and he failed to properly supervise

the incident management team which resulted in the disabling of an EDS Department all-terrain

vehicle and damage that necessitated an avoidable $700 repair.

229.    Both during and after Defendant Jones' deployment, he publicly defamed Ms. Lightheart to other ALM Division employees and Salvation Army officers assigned to THQ. He made it clear that he did not respect Ms. Lightheart as an EDS Director.

230.    Although, Ms. Lightheart attempted to express her concerns about Defendant Jones' behavior to her superiors, but because of his position and familial ties, they forced her to endure his misconduct.

231.    The Salvation Army also required Ms. Lightheart to endure an offensive hostile work environment created by Defendant Jellets. The Salvation Army is first a church, part of the Christian faith. It requires its employees to conduct their affairs consistent with the mission and belief system of the organization. Yet, The Salvation Army allowed Defendant Jellets to continue his offensive and inappropriate conduct unchecked and without penalty.

232.    In addition to subjecting Ms. Lightheart and others to his offensive, inappropriate, and unprofessional sexually explicit comments during meetings, training workshops, and in other professional settings, Defendant Jellets also made offensive and inappropriate religious based comments about Salvationists and their practices and offensive, inappropriate, and unprofessional comments and jokes about older employees and colleagues.

233.    Initially, Defendant Jellets limited his sexually inappropriate and offensive comments to verbal expressions. One example occurred while driving in a vehicle with Ms. Lightheart, Ms. Gore, and Mr. Freeman. Defendant Jellets made offensive references to male genitalia. In another example, while teaching a class consisting of mostly women, he made demeaning and offensive remarks to the group.

234.    In 2020, Mr. Jellets expanded his offensive, inappropriate and unprofessional comments to writings communicated in the form of text messages and emails of which Ms.

Lightheart was a recipient. The texts and emails often included as recipients members of The Salvation Army's leadership, providing evidence that the objectionable conduct was known to The Salvation Army. Despite leadership's inclusion in many of Defendant Jellets' writings, no one acted to curb his misbehavior.

235.    In fact, for years The Salvation Army allowed Defendant Jellets to repeat his offensive, inappropriate, and unprofessional comments publicly and unchecked during meetings, training workshops, and in other professional settings, and upon information and belief, did nothing to stop the escalation to the written dissemination of similarly offensive, inappropriate, and unprofessional comments by Defendant Jellets. In what can only be deemed as its support of Defendant Jellets' behavior, The Salvation Army seems to have emboldened Defendant Jellets rather than to dissuade his misconduct.

236.    Ms. Lightheart was included as a recipient of Defendant Jellets' written pornography and scripted sexually offensive communications. Inappropriate texts began in the spring of 2020, and his offensive email communications began on September 16, 2020. In an email communication that was intended to serve as a group notification about an impending tropical storm, Defendant Jellets' closing remarks included an unnecessary and offensive sexually explicit joke referring to male genitalia and other offensive content.

237.    As a Christian with a belief system similar to that of Salvationists, Ms. Lightheart was offended, perplexed, disturbed, and disappointed at The Salvation Army's refusal to squelch such inappropriate behavior and to refrain from taking action to protect its employees who were being subjected to such offensive, inappropriate, and unprofessional sexually explicit communications.

238.    Ms. Lightheart reported Defendant Jellets' offensive conduct to her direct supervisor, Defendant Hunter, who knew about Defendant Jellets' behavior. Defendant Hunter, however, failed to respond to Ms. Lightheart or address her concerns.

239.    Upon receiving no acknowledgement of her concerns and no reply to her email, Plaintiff Lightheart telephoned Defendant Hunter to inquire if he had received and reviewed her email. Though he spoke with her, Defendant Hunter evidenced utter disregard for Ms. Lightheart's concerns, sloughing off Defendant Jellets' misconduct by stating, "it was just Jeff being Jeff."

240.    Again, Ms. Lightheart's reports garnered no reaction from her superiors at The Salvation Army, and upon information and belief, no one at The Salvation Army ever reprimanded Defendant Jellets for his inappropriate, offensive, and unprofessional public behavior or attempted to correct his conduct.

241.    Defendant Jellets also frequently disparaged and harassed colleagues, subordinates, and other employees both publicly and in private. In fact, prior to Mr. Feist's termination and unbeknownst to Mr. Feist, Defendant Jellets had exhibited a long-time practice of making Mr. Feist the butt of Defendant Jellets' jokes.

242.    As a Salvation Army Soldier Mr. Feist was encouraged to wear a military-style uniform to church services. The Salvation Army also approved his wearing the uniform at other times of his choosing as an outward expression of his commitment to Salvationism. As a Salvationist employee, Mr. Feist chose to wear the uniform as his official EDS work attire.

243.    Although Defendant Jellets knew Mr. Feist was a Salvationist Defendant Jellets demonstrated behavior that conveyed he thought it was odd for Mr. Feist to wear the military-style uniform to work. Defendant Jellets publicly disparaged Mr. Feist's choice to wear the

uniform. This was done out of the hearing of Mr. Feist but in the presence of Mr. Feist's EDS peers. Defendant Jellets also made disparaging remarks about other aspects of Mr. Feists attire and about his behavior.

244.    When Ms. Lightheart deployed to the Salvation Army Southern Territory in 2018 for Hurricane Matthew, she experienced first-hand how Defendant Jellets promotes this offensive and inappropriate behavior among his staff and how this objectionable behavior was overlooked by his superiors.

245.    Ms. Lightheart was assigned to assist Defendant Jellets' employee Bobbi Geery with travel arrangements for disaster relief personnel. The assigned workstation was in a THQ workroom occupied by Defendant Jellets and his staff and frequently visited by Defendant Jellets' direct supervisor, Major Terry Israel.

246.    Although Ms. Lightheart was assigned to the location for only one day, it was all that was necessary to be exposed to Defendant Jellets and his employee Ms. Geery and witness the shocking, if not appalling, nature of what appeared to be typical conversations between them. They openly and continually disparaged potential disaster relief workers and those workers who were in the process of being deployed. Their offensive comments and discussions occurred well within the hearing of Major Israel who said nothing to stop the conversations, and seemed to regard the inappropriate, unprofessional, and offensive discussions as acceptable.

247.    As a Christian, employed by a church, Ms. Lightheart found The Salvation Army's acquiescence to these behaviors to be exceptionally offensive. Excluding all religious offense, the misconduct by Defendant Jellets violates The Salvation Army's employee policies.

248.    Despite reporting Defendant Jellets' hostilities and inappropriate behavior to her superiors, Ms. Lightheart experienced no change on the part of Defendant Jellets. His hostility and offensive contact continued into 2021.

249.    In January 2021, Defendant Hunter requested Plaintiff Lightheart attend an After-Action Briefing or Review regarding the 2020 disaster relief operations. The meeting was scheduled to be held at The Salvation Army ALM DHQ on Thursday, January 28, 2021.

250.    After Action Reviews ("AARs") are a common practice following disaster relief operations. An AAR's main purpose is to identify strengths and weaknesses related to the disaster relief operations to facilitate process improvement. Participants in such meetings are typically individuals who have first-hand experience or knowledge regarding the disaster. Usually there is a facilitator and a note taker. The facilitator is important for guiding the discussion, and the note taker is important for documenting the outcome of the meeting. An agenda is also provided to attendees to ensure meeting objectives are met. Standard practice also dictates the preparation of a report. Industry standards suggest an AAR should promote open discussion, and therefore, it is not generally considered an appropriate time for reprimands or harsh critiques.

251.    Ms. Lightheart organized an AAR for The Salvation Army for the 2016 Louisiana Flood Event. Ms. Lightheart secured a meeting room at the Mississippi Emergency Management Agency, and she invited participants, including her staff and others who had deployed in response to the disaster. A questionnaire form was distributed to participants weeks before the meeting to glean input, to help develop the AAR agenda, and to determine topics for discussion. She identified a facilitator and assigned a note taker. An agenda was provided, and a report was generated.

252.    An example of an AAR attended by Ms. Lightheart that followed a similar format is The Salvation Army Southern Territory AAR in Stone Mountain, Georgia, for the 2017 Hurricane Season. Attendees included all Southern Territory disaster services personnel. Ms. Lightheart attended the meeting with her staff. A facilitator and note taker were present; an agenda was distributed; and a report was developed and provided to participants.

253.    What was unusual about Defendant Hunter's request for the after-action briefing on January 28th is Defendant Hunter specifically instructed Ms. Lightheart not to prepare a briefing report and not to invite her only employee, Mr. Freeman, someone who had played a significant role in the record number of 2020 emergency responses. Furthermore, Defendant Hunter provided no agenda before or during the meeting, and no note taker was assigned to document the outcome of the meeting. This curious departure from the norm alerted Ms. Lightheart to the fact the meeting, though deemed an After-Action Briefing, was somehow unusual.

254.    Prior to January 2021, Ms. Lightheart had participated in one AAR with Defendant Hunter. This briefing occurred in July/August 2019, but it had followed the industry norms for AARs. At the 2019 meeting, the attendees included Defendant Hunter, who served as the facilitator, Dawn Oubre, Defendant Hunter's administrative assistant who was assigned the role of note-taker, Ms. Lightheart and Mr. Freeman. Prior to the meeting Ms. Lightheart prepared a report, and Captain Hunter provided a meeting agenda for those in attendance.

255.    The January 28, 2021 meeting attendees were Ms. Lightheart's supervisors, including Defendant Davis, the ALM Divisional Commander, and Defendant Hunter, the ALM Divisional Secretary for Business. Defendant Mike Hawley, General Secretary, was also present.

256.    Once the meeting started, Ms. Lightheart noticed there was no agenda provided to the participants, and Captain Hunter's assistant was not present to take notes. These omissions were further confirmation that the meeting was not a typical AAR.  Additionally, in Ms. Lightheart's nearly six years of employment with The Salvation Army this was the first and only occasion in which she was alone behind closed doors with only male officers present. She readily observed this was another departure from normal protocol for After-Action Briefings.

257.    Defendant Hunter began the meeting by announcing Defendant Jellets had requested Ms. Lightheart's department undergo an audit for all of the unprecedented number of disaster relief operations to which the ALM Division EDS Department had responded in 2020.

258.    Plaintiff Lightheart immediately recognized once again she was being singled out and, again, had been excluded by Defendants Hunter and Jellets regarding matters of the department she directed. In fact, this meeting was the first she had heard of an audit or the need for an audit.

259.    As the ALM Division EDS Director, The Salvation Army protocol required Ms. Lightheart to participate in a monthly EDS Territorial disaster coordination call facilitated by Defendant Jellets. At a minimum, Ms. Lightheart spoke to Defendant Jellets monthly.

260.    As part of the coordination efforts for disaster relief operations, however, Ms. Lightheart was also required to, at times, speak with Defendant Jellets regarding preparations for and responses to emergency and disaster events. In 2020, because of the volume of events and because of the number of incidents occurring simultaneously across two or even all three of the states encompassing Ms. Lightheart's Division, she spoke to Defendant Jellets far more often and some weeks, almost daily.

261.    Never at any time during any of the multitude of calls between Ms. Lightheart and Defendant Jellets did Defendant Jellets broach the idea of an audit with Ms. Lightheart, nor did Defendant Jellets intimate that there was a need for an audit. Furthermore, never did Defendant Jellets reveal to Ms. Lightheart the frequency of his conversations with Defendant Hunter regarding matters related to the provision of disaster services.

262.    Plaintiff Lightheart did not oppose a departmental audit nor would she have opposed Defendant Jellets request of an audit had the circumstances been different.

263.    In fact, the ALM Division and Salvation Army Southern Territory Human Resource Departments conducted audits of job descriptions in the fall of 2018 to which Ms. Lightheart and her staff participated. In this instance, all ALM Division department directors received an email notifying them of the audits and alerting them as to when the audits would occur. The departmental directors were also invited to a pre-audit training meeting and encouraged to submit questions and concerns about the process.  Defendants Hunter and Jellets had not followed this process in the pending audit of her department.

264.    Considering Defendant Jellets' and Hunter's harassing behaviors directed towards Ms. Lightheart, combined with Defendant Jones' actions and defamatory statements issued during the Hurricane Laura deployment, Ms. Lightheart held valid concerns about the nature of how such an audit had been planned, why her department was being treated differently, and why she was excluded from the initial planning meeting for the audit.

265.    Her concerns were exacerbated by an event that had occurred one year earlier, in January 2020. Defendant Hunter attempted to enter a false account of a conversation he had with Ms. Lightheart in her official personnel record for the purpose of tainting Ms. Lightheart's reputation and impeccable record. Defendant Hunter requested Defendant Oubre make the entry,

but after Ms. Lightheart provided a true account of the meeting, the matter was dropped. Upon information and belief, Defendant Hunter's attempts to tarnish Ms. Lightheart's employment record did not reach fruition.

266.    During the January 2021 meeting, Ms. Lightheart immediately questioned whether the audit was retaliatory.  Upon information and belief, Defendant Hunter is believed to have been collaborating with Defendant Jellets in the promulgation of a retaliatory scheme against Ms. Lightheart, which may have been further fueled by Defendant Jones.

267.    Another more practical concern was the daunting tasks and incredibly time-consuming process required by such an audit.  Ms. Lightheart had difficulty imagining how she and Mr. Freeman would be able to accomplish the undertaking in light of the challenges presented by 2020, given the widespread severity of the COVID-19 pandemic and the numbers of tornados, floods, storms, and hurricanes across Alabama, Louisiana, and Mississippi to which the ALM Divisional EDS Department had responded in 2020.

268.    What contributed to the burden of such an undertaking is the fact that Ms. Lightheart's department was still operating with two-thirds of the allocated personnel and essentially no financial resources.  The ALM Division refused to replace Mr. Feist, the employee the Department had lost, ostensibly because there were no funds from which to pay a salary. With very little manpower and almost no physical resources, Ms. Lightheart found herself quickly realizing what lay ahead as she attempted to meet the demands of her department's daily obligations and responsibilities while simultaneously attempting to meet the requirements of the disaster audit prompted by what she suspected to be retaliatory motives by Defendants Jellets, Hunter, and Jones.

269.    The number and concentration of emergency and disaster events in 2020 caused all eight divisions of the Salvation Army Southern Territory to become involved in disaster relief operations. Following the January 28th meeting, Ms. Lightheart learned Defendant Jellets requested an audit of her Department, alone. He slated no other EDS Department in the Southern Territory for audit.  All appearances were that her fears were being confirmed, and Defendants Hunter, Jellets, and Jones were employing the audit as harassment, retaliation, or because of some similar motives.

270.    Furthermore, Defendant Jellets had requested and received The Salvation Army's approval to contract with his long-time friend Defendant Kevin Smith to oversee the audit of Ms. Lightheart's department.

271.    Defendant Smith launched Rule One, a consulting business, in January 2021. Upon information and belief, Defendant Jellets' reasons for hiring Defendant Smith and his new consulting business were at least twofold.

272.    First, by providing Defendant Smith a contract with The Salvation Army, Defendant Jellets would be assisting his friend in both the financing and marketing of Rule One. Secondly, by having a friend who might possibly be beholden to Defendant Jellets, Defendant Jellets would be more likely to affect the outcome of the audit of Ms. Lightheart's Department, which, in essence, also served as an audit of Ms. Lightheart, both personally and professionally.

273.    The Salvation Army had previously employed Defendant Smith as The Salvation Army's Divisional EDS Director for the Florida Division, also in the Salvation Army-Southern Territory.  While managing Florida's EDS Department, Defendant Smith became the subject of his own employment discrimination and retaliation lawsuit.  The litigation commenced in the

U.S. District Court for the Middle District of Florida in September 2018, and The Salvation Army settled the suit in April 2019.

274.    Of further note, upon information and belief, Defendant Jones was a Salvationist Soldier employee of Defendant Smith in Florida, prior to Defendant Jones becoming a Salvation Army Officer and receiving his commission.

275.    Returning to the January 28th meeting, Defendant Hunter asked Ms. Lightheart to respond to questions concerning the ALM Division EDS Department's responses to the events of 2020.

276.    Ms. Lightheart attempted to respond to each of the questions posed. The questions offered Ms. Lightheart another opportunity to explain the challenges of 2020 and to, again, report to her superiors the objectionable and offensive conduct, questionable events, and wrongful acts she had witnessed, experienced, and to which she had been subjected. The meeting also presented her with another opportunity to voice her concerns about how those behaviors, events, and acts detracted from The Salvation Army's stated Mission and Purpose.

277.    She, again, reported to her superiors the ongoing misconduct of her colleague, Defendant Jellets; the hostile work environment created by him and a number of Salvation Army officers, including Defendant Jones; the efforts by The Salvation Army to conceal the misconduct; the endeavors by The Salvation Army to disguise the discriminatory practices of The Salvation Army's officers and other staff personnel in positions of authority; the mismanagement, misappropriation, and misallocation of disaster funds, mostly emanating from public donations, and the mismanagement, misappropriation, and misallocation of other financial and physical resources by both staff personnel and The Salvation Army's commissioned officers.

278.    Defendant Davis's and Defendant Hunter's reactions to Ms. Lightheart's reports were disappointing.  The officers responded by defending the complained of actions, by verbally attacking Ms. Lightheart's perspectives, by issuing intimidating threats, and by furthering what can only be described as ongoing harassment of Ms. Lightheart.

279.    In the January 28th meeting, Ms. Lightheart had an opportunity to, again, reference Defendant Jellets offensive, inappropriate, and unprofessional conduct during the August 27th national call. Defendant Davis acknowledged he was a participant on the call in which Defendant Jellets berated and harassed Ms. Lightheart.

280.    Further, Defendant Davis admitted to knowing of Defendant Jellets' propensities but informed Plaintiff Lightheart that The Salvation Army held Defendant Jellets in such regard that should she continue to lodge her complaints her job security was at risk.

281.    Defendant Davis further instructed Ms. Lightheart, that at the end of the day, despite Defendant Jellets known misconduct, she still had to work with him. He advised Ms. Lightheart to agree and simply do as she was directed.

282.    Plaintiff Lightheart continued to attempt to respond to her superiors' questions and to address the matters raised by them, but she found her fears were mounting; she was growing more perplexed about what was happening; her confusion about the departure from the protocols of previous briefings was escalating; she was feeling more wrongfully maligned by her colleagues; and she realized her job was in real peril, not because of any wrongdoing on her part but because she dared speak out to report behaviors and misconduct that opposed the Mission and Purpose of her employer, The Salvation Army.

283.    Her superiors refused to address the ongoing objectionable conduct by other officers', other colleagues, and Defendant Jellets, and her superiors' seemed to accept the

officers' misappropriation of donated funds. Additionally, her superiors acquiesced to Defendant Jellets' inappropriate and objectionable conduct, as they adopted an approach, at least in the briefing, that called Ms. Lightheart's performance into question. Together, the totality of Defendants Hunters' and Davis' reaction triggered waves of disillusionment in Ms. Lightheart.

284.    The results of her superiors' expressed message and their lack of willingness to address the multitude of objectionable behaviors left Ms. Lightheart feeling defenseless against her superiors, unprotected from other officers with whom she was forced to work, exposed to Defendant Jellets and his influence, vulnerable to other co-workers whose misconduct appeared to be rewarded, and completely unsupported by the Christian organization she had held in such high esteem.

285.    It was clear to Ms. Lightheart that her superiors – Salvation Army Officers who had sworn an oath against the injustices of society and who were ordained Christian ministers – were not only leaving her to defend herself against Defendant Jellets' devious maneuverings, unwelcome offensive communications, and the organization's insidious discriminatory attacks but also that they were sending a message that made them appear to Ms. Lightheart to be joining in Defendant Jellets', other colleagues', and the other officers' transgressions.

286.    Ms. Lightheart believed her superiors were wrongfully attempting to discredit her and undermine her abilities and performance. These attempts were particularly hurtful given the success of her department amidst unfathomable difficulties.

287.    As her fears continued to grow, Ms. Lightheart became increasingly defensive in response to her superiors' verbal criticisms. Feeling attacked, Ms. Lightheart reacted in a way that was out of character, but in a way that would not have occurred but for the defenseless position in which she found herself.

288.    At a point when she believed she could not proceed with the meeting one minute longer, she requested to be able to stop the meeting and postpone its continuation. Defendant Hunter acknowledged that a break was needed; however, the officers' attacks continued until Ms. Lightheart excused herself exclaiming that she needed to have someone present with her who could stand by her.

289.    The meeting adjourned with an understanding by Ms. Lightheart that the meeting would resume at a future time to be determined when she would be allowed to have an advocate present.

290.    Five days later, on Tuesday, February 2, 2021, The Salvation Army terminated Ms. Lightheart's employment for reasons they stated as "unprofessional and insubordinate conduct" during the After-Action Briefing held on Thursday, January 28, 2021.

291.    Until Ms. Lightheart's termination, The Salvation Army had never issued any negative reviews, performance warnings, or reprimands concerning Ms. Lightheart or her job performance.  In fact, all of Ms. Lightheart's performance evaluations were reported as satisfactory and either meets or exceeds expectations.

292.    Ms. Lightheart, and Defendants Hunter, Davis, and Hawley had all attended many previous briefings and meetings facilitated by Plaintiff Lightheart and conducted under unusually stressful circumstances. At all times, Plaintiff Lightheart conducted herself in the utmost professional manner. In fact, for the entirety of her Salvation Army career, Plaintiff Lightheart had completed significant due diligence to ensure she represented the values of The Salvation Army at all times, both internally within the organization and externally in the community. As such she received letters of appreciation from other commissioned officers in the Southern Territory commending her for her high level of professionalism.

293.    In fact, Ms. Lightheart excelled in the core competencies of communication and leadership on her annual performance reviews, always earning "exceeds expectations."

294.    The Salvation Army's Employee Handbook ("Handbook") establishes that The Salvation Army has a progressive discipline system in place to address inappropriate behavior. The system is intended to inform employees of serious transgressions and provide the employees an opportunity to correct the issue.

295.    Further, the Handbook reserves the right on behalf of The Salvation Army to bypass the progressive discipline process in consideration of the severity, frequency, and/or combination of infractions.

296.    Rather than issue corrective action or other behavior modifications, such as a Performance Improvement Plan, that would comply with The Salvation Army's Progressive Discipline System, The Salvation Army terminated Ms. Lightheart on the first occurrence of any questionable behavior.

297.    The Salvation Army's termination of Ms. Lightheart, its failure to activate its Progressive Discipline System prior to termination, and its decision to discipline Ms. Lightheart at all are further examples of how The Salvation Army treated Ms. Lightheart differently.

298.    Compounding The Salvation Army's offenses against Ms. Lightheart, after terminating her employment, The Salvation Army allowed Defendant Jellets to hire Defendant Smith and/or Defendant Rule One to participate in the hiring of Ms. Lightheart's replacement. Following her termination, there was no further discussion of an audit of the ALM Division EDS Department.

299.    Additionally, The Salvation Army hired as Ms. Lightheart's replacement, upon the recommendations of both Defendant Smith and Defendant Jellets, a younger male

Salvationist who possessed no college degree related to Emergency Management or any other related field, no formal education regarding emergency and disaster management or response, no certifications regarding emergency and disaster management or response, no specific training regarding emergency and disaster management or response, and no specific experience regarding emergency and disaster management or response.

**COUNT ONE**

**RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. §§ 2000e et seq.)**

**(PLAINTIFF LIGHTHEART AS TO THE SALVATION ARMY, SALVATION ARMY USA, SALVATION ARMY SOUTHERN TERRITORY, JELLETS, HUNTER, DAVIS, JONES, AND OUBRE)**

300.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 299, as if fully stated herein.

301.    Plaintiff Lightheart is a Christian, but she is not a parishioner, member, or adherent of The Salvation Army Church. Therefore, Plaintiff Lightheart is a member of the Protected Class.

302.    Plaintiff Lightheart was qualified for her position when Defendant The Salvation Army fired her.

303.    In addition, Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre marginalized Plaintiff Lightheart while treating similarly situated employees more favorably.

304.    Specifically, William "Bill" Feist, a Salvationist, exhibited extreme dissatisfaction with his superiors resulting in a dramatic episode that included his banging fists and yelling at his superiors. The Salvation Army disciplined or sanctioned Mr. Feist by changing his job title. The penalty suffered by Mr. Feist was limited to a change in his job title.  The Defendants did not

reduce Mr. Feist's pay, nor did they suspend him from his work in the EDS Department, nor did they terminate his employment with The Salvation Army.  They simply changed his job title.

305.    Contrary to Mr. Feist's episode, Ms. Lightheart was terminated for expressing herself passionately without cursing or fist banging in a far less egregious manner during a pretextual meeting in which she was attempting to express her concerns and dissatisfaction with what she believed was The Salvation Army's fraudulent mismanagement and misappropriation of donated monies, her department's inexplicable lack of resources as compared to other territorial EDS departments, and her superiors' dismissal of her numerous complaints of officers' and colleagues' repeated offensive, inappropriate, and unprofessional harassment all of which amounts to conduct in conflict with The Salvation Army's Mission and Purpose.

306.    While Plaintiff Lightheart did raise her voice in frustration and in defense of her position when she felt overwhelmed and verbally assaulted, she never yelled, nor did she bang her fists, nor did she point her finger in the face of any superior. In contradiction to the erroneous claims of Defendants, Plaintiff Lightheart never reacted in such a way to cause a chair to be overturned.  Nevertheless, Defendants fired Plaintiff Lightheart on the pretexts that she exhibited insubordinate and unprofessional behavior during the meeting.

307.    Furthermore, after terminating Plaintiff Lightheart, Defendants replaced her as the ALM Division's Emergency Disaster Services Director by hiring a younger, male adherent of The Salvation Army Church who has no formal education, training, or experience in Emergency Management but does have immediate family members who are also Salvation Army Officers.

308.    Plaintiff Lightheart has been discriminated against by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones,

and Oubre because of her religion and subjected to both a subjectively and objectively hostile work environment due to her religious affiliation.

309.    The actions and omissions of Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre constitute discriminatory treatment of Plaintiff Lightheart, which was sufficiently severe or pervasive to alter the conditions of Ms. Lightheart's employment and created an abusive and hostile working environment.

310.    The above-discussed religious discrimination violated Title VII.

311.    Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre intentionally violated Plaintiff Lightheart's rights under Title VII, with malice or reckless indifference, and, as a result, are liable for punitive damages.

312.    Plaintiff Lightheart has suffered, is now suffering, and will continue to suffer damages as a result of Defendants' unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, pain, inconvenience, mental anguish, loss of enjoyment of life, the costs of bringing this action, and other nonpecuniary losses as a direct result of the Defendants' violation of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff Lightheart prays this Court:

a.    Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre to be in violation of Plaintiff Lightheart's rights;

b.    Enjoin Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre from engaging in such conduct in the future;

c.    Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d.  Award Plaintiff Lightheart costs and attorneys' fees; and

e.  Grant such further and other, different relief, including equitable, as this Court deems just and proper.

## COUNT TWO

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

### (42 U.S.C. §§ 2000e et seq.)

### (PLAINTIFF LIGHTHEART AS TO THE SALVATION ARMY, SALVATION ARMY USA, SALVATION ARMY SOUTHERN TERRITORY, JELLETS, HUNTER, DAVIS, JONES, AND OUBRE)

313.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 312, as if fully stated herein.

314.    Plaintiff Lightheart is female and a member of the Protected Class.

315.    Plaintiff Lightheart was qualified for her position when Defendant The Salvation Army fired her.

316.    In addition, Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre marginalized Plaintiff Lightheart while treating similarly situated employees more favorably.

317.    Specifically, William "Bill" Feist, a male Salvationist, exhibited extreme dissatisfaction with his superiors resulting in a dramatic episode that included his banging fists and yelling at his superiors. The Salvation Army disciplined or sanctioned Mr. Feist by changing his job title. The penalty suffered by Mr. Feist was limited to a change in his job title.  The Defendants did not reduce Mr. Feist's pay, nor did they suspend him from his work in the EDS Department, nor did they terminate his employment with The Salvation Army.  They simply changed his job title.

318.    Contrary to Mr. Feist's episode, Ms. Lightheart was terminated for expressing herself passionately without cursing or fist banging in a far less egregious manner during a pretextual meeting in which she was attempting to express her concerns and dissatisfaction with what she believed was The Salvation Army's fraudulent mismanagement and misappropriation of donated monies, her department's inexplicable lack of resources as compared to other territorial EDS departments, and her superiors' dismissal of her numerous complaints of officers' and colleagues' repeated offensive, inappropriate, and unprofessional harassment all of which amounts to conduct in conflict with The Salvation Army's Mission and Purpose.

319.    While Plaintiff Lightheart did raise her voice in frustration and in defense of her position when she felt overwhelmed and verbally assaulted, she never yelled, nor did she bang her fists, nor did she point her finger in the face of any superior. In contradiction to the erroneous claims of Defendants, Plaintiff Lightheart never reacted in such a way to cause a chair to be overturned.  Nevertheless, Defendants fired Plaintiff Lightheart on the pretexts that she exhibited insubordinate and unprofessional behavior during the meeting.

320.    Furthermore, after terminating Plaintiff Lightheart, Defendants replaced her as the ALM Division's Emergency Disaster Services Director by hiring a younger, male adherent of The Salvation Army Church who has no formal education, training, or experience in Emergency Management but does have immediate family members who are also Salvation Army Officers.

321.    Plaintiff Lightheart has been discriminated against by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre because of her gender and subjected to both a subjectively and objectively hostile work environment due to her female gender.

322.    The actions and omissions of Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre constitute discriminatory treatment of Plaintiff Lightheart, which was sufficiently severe or pervasive to alter the conditions of Ms. Lightheart's employment and created an abusive and hostile working environment.

323.    The above-discussed sexual discrimination violated Title VII.

324.    Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre intentionally violated Plaintiff Lightheart's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

325.    Plaintiff Lightheart has suffered, is now suffering, and will continue to suffer damages as a result of Defendants' unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, pain, inconvenience, mental anguish, loss of enjoyment of life, the costs of bringing this action, and other nonpecuniary losses as a direct result of the Defendants' violation of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff Lightheart prays this Court:

a.  Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre to be in violation of Plaintiff Lightheart's rights;

b.  Enjoin Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre from engaging in such conduct in the future;

c.  Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d.  Award Plaintiff Lightheart costs and attorneys' fees; and

e.  Grant such further and other, different relief, including equitable, as this Court deems just and proper.

## COUNT THREE

### AGE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (42 U.S.C. §§ 2000e et seq.)

### (PLAINTIFF LIGHTHEART AS TO THE SALVATION ARMY, SALVATION ARMY USA, SALVATION ARMY SOUTHERN TERRITORY, JELLETS, HUNTER, DAVIS, JONES, AND OUBRE)

326.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 325, as if fully stated herein.

327.    Plaintiff Lightheart is over the age of 40 and a member of the Protected Class. She was qualified for her position when Defendant The Salvation Army fired her.

328.    In addition, Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre marginalized Plaintiff Lightheart while treating similarly situated employees more favorably.

329.    Specifically, after terminating Plaintiff Lightheart, Defendants replaced her as the ALM Division's Emergency Disaster Services Director by hiring a younger, male adherent of The Salvation Army Church who has no formal education, training, or experience in Emergency Management but does have immediate family members who are also Salvation Army Officers.

330.    Plaintiff Lightheart has been discriminated against by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre because of her age and subjected to both a subjectively and objectively hostile work environment due to her age.

331.    Defendant Salvation Army's actions and omissions constitute discriminatory treatment of Plaintiff Lightheart, which was sufficiently severe or pervasive to alter the

conditions of Ms. Lightheart's employment and created an abusive and hostile working environment.

332.    The above-discussed age discrimination violated Title VII.

333.    Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre intentionally violated Plaintiff Lightheart's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

334.    Plaintiff Lightheart has suffered, is now suffering, and will continue to suffer damages as a result of Defendants' unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, pain, inconvenience, mental anguish, loss of enjoyment of life, the costs of bringing this action, and other nonpecuniary losses as a direct result of the Defendants' violation of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff Lightheart prays this Court:

a.    Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre to be in violation of Plaintiff Lightheart's rights;

b.    Enjoin Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre from engaging in such conduct in the future;

c.    Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d.    Award Plaintiff Lightheart costs and attorneys' fees; and

e.    Grant such further and other, different relief, including equitable, as this Court deems just and proper.

<u>COUNT FOUR</u>

HOSTILE WORK ENVIRONMENT

(42 U.S.C. §§ 2000e et seq.)

(PLAINTIFF LIGHTHEART AS TO THE SALVATION ARMY, SALVATION ARMY USA, SALVATION ARMY SOUTHERN TERRITORY, JELLETS, HUNTER, DAVIS, JONES AND OUBRE)

335.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 334, as if fully stated herein.

336.    Plaintiff Lightheart was at all times material hereto an employee covered by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-16(a) and 42 U.S.C.A. § 2000e-2(a), prohibiting hostile work environment harassment on the basis of an employee's religion, sex, and age.

337.    Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory are, and at all times material to this Complaint were, prohibited by 42 U.S.C.A. § 2000e-2(a) from discriminating against or harassing its employees by creating a hostile work environment because of an employee's protected status.

338.    Defendants harassed Plaintiff on the basis of her religion, her gender, and/or her age in violation of Title VII, 42 U.S.C.A. § 2000e-2(a), by engaging in a course of conduct which included, but is not limited to, at least some of the acts set forth in this Complaint.

339.    Defendant discriminated against Plaintiff Lightheart because of her religion, gender, and/or age in violation of 42 U.S.C.A. § 2000e-16(a) and 42 U.S.C.A. § 2000e-2(a) by creating a hostile work environment, or knowingly permitting such an environment to exist and failing to take prompt, effective remedial action reasonably calculated to end the harassment, including, but not limited to, at least some of the acts set forth in this Complaint.

340.    Examples of these acts include the communications by Defendant Jellets consisting of verbal statements made during meetings, telephone calls, and workshops, and

written statements made in email transmissions.  All of these communications contained offensive, inappropriate, and unprofessional jokes, vignettes, stories, jabs, and statements addressing matters of a religious nature, a sexual nature, and/or condemnations of aging persons.

341.    Defendant created and/or permitted the hostile work environment through a series of acts or actions so severe and/or pervasive in nature, as to alter the terms and conditions of Plaintiff Lightheart's employment and that Plaintiff, in fact, found intolerable as would any reasonable person placed in that situation.

342.    As a proximate result of Defendants' harassment against Plaintiff Lightheart, she has suffered and continues to suffer substantial losses in earnings, bonuses, and other employment benefits and has suffered, and continues to suffer, embarrassment, humiliation, and mental anguish, all to her damage in an amount according to proof.

343.    As a result of Defendants' discriminatory acts as alleged in this Complaint, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by 42 U.S.C.A. § 2000e-5(k).

WHEREFORE, Plaintiff Lightheart prays this Court:

a.  Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre to be in violation of Plaintiff Lightheart's rights;

b.  Enjoin Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre from engaging in such conduct in the future;

c.  Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d.  Award Plaintiff Lightheart costs and attorneys' fees; and

e.  Grant such further and other, different relief, including equitable, as this Court deems just and proper.

**COUNT FIVE**

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. §§ 2000e et seq.)**
**(PLAINTIFF LIGHTHEART AS TO THE SALVATION ARMY)**

344.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 343, as if fully stated herein.

345.    On January 28, 2021, Plaintiff Lightheart engaged in protected activity by complaining to her superiors, Defendants Hunter, Davis, and Hawley, and reporting the ongoing misconduct of her colleague, Defendant Jellets; the hostile work environment created by him, other colleagues, and a number of Salvation Army officers, including Defendant Jones, the son-in-law of the Southern Territorial Commanders; the efforts by The Salvation Army to conceal the misconduct; the endeavors by The Salvation Army to disguise the discriminatory practices of The Salvation Army's officers and other staff personnel in positions of authority; the mismanagement, misappropriation, and misallocation of disaster funds, mostly emanating from public donations; and the mismanagement, misappropriation, and misallocation of other financial and physical resources by both staff personnel and The Salvation Army's commissioned officers.

346.    Only five (5) days later on February 3, 2021, Defendant The Salvation Army summarily fired Ms. Lightheart purportedly because of unprofessional and insubordinate behavior after Plaintiff Lightheart complained of the ongoing misconduct of her colleague, Defendant Jellets; the hostile work environment created by him, other colleagues, and a number of Salvation Army officers, including Defendant Jones, the son-in-law of the Southern Territorial Commanders; the efforts by The Salvation Army to conceal the misconduct; the endeavors by The Salvation Army to disguise the discriminatory practices of The Salvation Army's officers and other staff personnel in positions of authority; the mismanagement, misappropriation, and

misallocation of disaster funds, mostly emanating from public donations; and the mismanagement, misappropriation, and misallocation of other financial and physical resources by both staff personnel and The Salvation Army's commissioned officers.

347.   Defendants' stated reason for terminating Ms. Lightheart's employment is pretextual and baseless. Defendants fired Ms. Lightheart because she reported the ongoing misconduct of her colleague, Defendant Jellets; the hostile work environment created by him, other colleagues, and a number of Salvation Army officers, including Defendant Jones, the son-in-law of the Southern Territorial Commanders; the efforts by The Salvation Army to conceal the misconduct; the endeavors by The Salvation Army to disguise the discriminatory practices of The Salvation Army's officers and other staff personnel in positions of authority; the mismanagement, misappropriation, and misallocation of disaster funds, mostly emanating from public donations; and the mismanagement, misappropriation, and misallocation of other financial and physical resources by both staff personnel and The Salvation Army's commissioned officers during a meeting called by her direct report Defendant Hunter on the false pretext of being an After-Action Briefing and which was attended only by two other male Salvation Army divisional officers.

348.   Plaintiff Lightheart has suffered, is now suffering, and will continue to suffer damages as a result of Defendants' unlawful retaliatory actions, including past and future lost wages and benefits, emotional distress, pain, inconvenience, mental anguish, loss of enjoyment of life, the costs of bringing this action, and other nonpecuniary losses as a direct result of the Defendants' violation of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff Lightheart prays this Court:

a. Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre to be in violation of Plaintiff Lightheart's rights;

b. Enjoin Defendants The Salvation Army, Salvation Army USA, Salvation Army Southern Territory, Jellets, Hunter, Davis, Jones, and Oubre from engaging in such conduct in the future;

c. Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d. Award Plaintiff Lightheart costs and attorneys' fees; and

e. Grant such further and other, different relief, including equitable, as this Court deems just and proper.

## COUNT SIX

### VIOLATION OF THE FAIR LABOR STANDARDS ACT

### (29 U.S.C. §§ 201, et seq.)

### (PLAINTIFF LIGHTHEART AND THOSE SIMILARLY SITUATED AS TO THE SALVATION ARMY)

349.    Plaintiff Lightheart realleges and incorporates by reference paragraphs 1 through 348, as if fully stated herein.

350.    The overtime provisions set forth in the FLSA, 29 U.S.C. §§ 201, et seq., and the supporting federal regulations, apply to Defendant The Salvation Army and protect Plaintiff Lightheart and the FLSA Collective.

351.    Defendant The Salvation Army has failed to pay Plaintiff Lightheart and the FLSA Collective overtime for hours they worked in excess of forty (40) hours in a work week.

352.    As a result of Defendant The Salvation Army's unlawful acts, Plaintiff Lightheart and the FLSA Collective have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, attorneys' fees, costs, and other compensation pursuant to the FLSA.

353.    Defendant The Salvation Army's unlawful conduct, as described in this Complaint, has been intentional and willful. Defendant The Salvation Army was aware or should have been aware that the practices described in this Complaint were unlawful. Defendant The Salvation Army has not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff Lightheart and the FLSA Collective.

354.    Because Defendant The Salvation Army's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

WHEREFORE, Plaintiff Lightheart prays this Court:

a.    Declare the conduct engaged in by Defendants The Salvation Army, Salvation Army USA, and Salvation Army Southern Territory to be in violation of Plaintiff Lightheart's rights;

b.    Enjoin Defendants from engaging in such conduct in the future;

c.    Award Plaintiff Lightheart compensatory and punitive damages, including back pay, in an amount to be determined by this Court;

d.    Award Plaintiff Lightheart costs and attorneys' fees; and

e.    Grant such further and other, different relief, including equitable, as this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff Lightheart requests a jury trial on all questions of fact raised in this Complaint.

Respectfully submitted,

***Counsel for Plaintiff, Terry Lightheart***

Cynthia A. Brown, Bar No. 8894
P. O. Box 1942
Brandon, Mississippi 39043
cbrown@cynbrownlaw.com
601-896-6696